NADIA AZIZ (SBN 252966)
nadia.aziz@lawfoundation.org
LAUREN CARDEN (SBN 279410)
lauren.carden@lawfoundation.org
MICHAEL TRUJILLO (SBN 326461)
michael.trujillo@lawfoundation.org
LAW FOUNDATION OF SILICON VALLEY
4 North Second Street, Suite 1300
San Jose, CA 95113
Telephone: (408) 280-2410
Facsimile: (408) 293-0106

WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
GRAYCE ZELPHIN (SBN 279112)
gzelphin@aclunc.org
BRANDON GREEN (SBN 293783)
bgreene@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

THOMAS ZITO (SBN 304629)
tzito@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511

DEANNA L. KWONG (SBN 233480)
deanna.l.kwong@hpe.com
HEWLETT PACKARD ENTERPRISE
6280 America Center Drive
San Jose, CA 95002
Telephone: (650) 258-3307
*Pro Bono Counsel*

QUYEN TA (SBN 229956)
qta@kslaw.com
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1227
*Pro Bono Counsel*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| CELERINA NAVARRO, JANET STEVENS, ARMANDO COVARRUBIAS, EVELYN ESTRADA, GABRIEL RANGEL JAIME, ALMA ALDACO, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF MOUNTAIN VIEW,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE UNITED STATES CIVIL RIGHTS ACT (42 U.S.C. § 1983), AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132), SECTION 504 OF THE REHABILITATION ACT (29 U.S.C.§ 794), AND THE U.S. AND CALIFORNIA CONSTITUTIONS** |

**INTRODUCTION**

1.      The City of Mountain View ("City") is in the heart of Silicon Valley where, in recent years, an economic stratification has yielded significant wealth for some, but skyrocketing housing prices for all.  As a result, many of Mountain View's long-time residents have been priced out of the housing market and forced to live in recreational vehicles ("RVs")[1] parked on the City's streets.  Rather than implementing long-term and sustainable affordable housing programs to protect its lower-income residents, the City seeks to expel its indigent residents whose life circumstances require them to live in their vehicles.  To that end, the City has enacted and plans to enforce a ban on the parking of "oversized vehicles[2]" ("OSVs") on the City's streets ("OSV Ban").  Although the City claims the OSV Ban is motivated by the need for "traffic safety," in fact, it is designed to banish the City's low-income populations.

2.      The two components of the OSV Ban are Ordinance No. 14.19 (the "Bike Lanes Ordinance"), amending Chapter 19 of the Mountain View City Code, and Ordinance No. 15.19 (the "Narrow Streets Ordinance"), amending Chapter 36 and Chapter 19 of the Mountain View City Code.  The Bike Lanes Ordinance bans OSVs from parking on any streets with Class II Bikeways.[3]  The Narrow Street Ordinance makes it illegal to park OSVs on any street less than or equal to forty (40) feet in width.  Violations of either Ordinance can result the immediate towing and impoundment of RVs along with excessive fines to reclaim the vehicle—vehicles that are the only shelter available to Plaintiffs and members of the proposed Class.  Together,

---

[1] The term "RVs" as used in this Complaint refers to all vehicles being used for human habitation regardless of the vehicle's technical classification or exact size, excepting only passenger cars, and including but not limited to motorhomes, trailers, busses, vans, fifth-wheels, flatbed trucks, and campers.

[2] "Oversized Vehicle" is defined in the Mountain View City Code Chapter 19, Article I, Section 19.1 as any vehicle which exceeds twenty-two (22) feet in length, or seven (7) feet in width, or seven (7) feet in height.  Under this definition, nearly all RVs are considered by Mountain View to be "Oversized Vehicles."

[3] Class II Bikeways are defined in the California Streets and Highways Code section 890.4 as bike lanes that provide restricted right-of-way designated for the exclusive or semi-exclusive use of bicycles with through travel by motor vehicle or pedestrians prohibited, but with vehicle parking and crossflows by pedestrians and motorist permitted.  Class II facilities designate an on-road bicycle lane, typically 5-6′ wide, according to the California Highways Design Manual (HDM).

COMPLAINT                                                    Case No.: _____

these Ordinances make it virtually impossible for persons who must live in their RVs to do so in Mountain View.

3.     Plaintiffs in this action are six individuals who reside in RVs parked on the City's streets: Celerina Navarro, Janet Stevens, Gabriel Rangel Jaime, Armando Covarrubias, Evelyn Estrada, and Alma Aldaco.  Plaintiffs live in fear of having their vehicular homes, and nearly all their possessions, towed by City authorities for violating the OSV Ban.

4.     The impact of the OSV Ban on Plaintiffs' lives is severe.  For example, two Plaintiffs have children enrolled at schools in the City.  The OSV Ban threatens these students' access to education.  Indeed, Plaintiffs are informed and believe there are at least 11 families residing in RVs in Mountain View with children enrolled in the Mountain View - Los Altos School District.  As another example, three Plaintiffs have health conditions requiring them to reside in close proximity to their medical facilities.  The OSV Ban threatens their access to necessary healthcare.

5.     The OSV Ban is unconstitutional under federal and California law because it violates the inalienable rights of vulnerable individuals who have been forced to seek shelter in RVs in order to remain in the City and access medical care, schools, employment, and other resources available to them in their community.  Additionally, for the several Plaintiffs who are disabled, the OSV Ban violates the protections guaranteed to them under the Americans with Disabilities Act (ADA).

6.     For the benefit of themselves and on behalf of a class of others similarly situated, Plaintiffs bring this action against the City for declaratory and injunctive relief that the OSV Ban is invalid and unenforceable on each and all of the claims set forth below:

(1)    Excessive Fines and Fees (Eighth Amendment of the U.S. Constitution)

(2)    Excessive Fines and Fees (Cal. Const. Article I, § 17)

(3)    Violation of Substantive Due Process – State Created Danger (Fourteenth Amendment of the U.S. Constitution)

(4)    Unlawful Seizure of Property by Towing (Fourth Amendment of the U.S. Constitution)

2

(5)   Unlawful Seizure of Property by Towing (Article I, § 13 of the California Constitution)

(6)   Violation of Plaintiffs' Right to Privacy (Article I, Section 1 of the California Constitution)

(7)   Violation of Plaintiffs' Right to Free Movement (Fourteenth Amendment of the U.S. Constitution); and

(8)   Violation of Plaintiffs' Right to Free Movement/Travel (Article I, §§ 7(a) and 24 of the California Constitution).

7.     Plaintiffs Celerina Navarro, Janet Stevens, and Alma Aldaco bring the following four additional claims, on behalf of themselves and a disability subclass:

(9)   Violations of Title II of the Americans with Disabilities Act;

(10)   Violation of Section 504 of the Rehabilitation Act of 1973;

(11)   Violation of the California Disabled Persons Act; and

(12)   Violation of California Government Code Section 11135.

8.     The City has announced that it intends to commence enforcement of the OSV Ban in phases during the second half of 2021, which will result in the Plaintiffs being threatened with the towing and impoundment of their homes and receiving citations and fines.  While the OSV Ban has not yet been enforced against Plaintiffs, the impending enforcement creates significant uncertainty in the lives of Plaintiffs and all others similarly situated individuals.  Because as recently as June 10, 2021, the City has expressed its intent to enforce the OSV Ban, and there is no indication to the contrary, Plaintiffs' claims are presently ripe for determination.  The Court can and should enjoin the unlawful towing of Plaintiffs' homes *before* the threatened injury occurs.

9.     The United States Constitution, the California Constitution, and other applicable laws prohibit the City from casting out its poor and vulnerable populations because they do not have and cannot afford more permanent, traditional housing.  This Court should enjoin the enforcement of the OSV Ban which, if not stopped, will continue to wreak havoc on Plaintiffs and all others similarly situated, in violation of their rights.

COMPLAINT                    Case No.: _____

## PARTIES

10.     Plaintiff CELERINA NAVARRO has resided in the City for nineteen years, since 2002, and currently resides in an RV with her 11-year-old daughter and 17-year-old son, who are enrolled at school in Mountain View.  From 2002 to 2015, Ms. Navarro lived with her kids in apartments in the City until they could no longer afford to pay the market rate rent.  For the past two years, Ms. Navarro has been in and out of the hospital for treatment related to a brain tumor. She is currently receiving medical care through a team at Stanford Hospital.  Ms. Navarro's medical conditions make her a qualified individual with disabilities within the meaning of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12102, and the Rehabilitation Act of 1973, 29 U.S.C. § 705(20).  Once the OSV Ban is enforced, her home will be subject to towing.

11.     Plaintiff JANET STEVENS, a 63-year-old native of Mountain View, resides in an RV parked on the City's streets.  Ms. Stevens lives with chronic fatigue syndrome and high blood pressure and is undergoing follow-up treatment for breast cancer.  Ms. Steven's medical conditions make her a qualified individual with disabilities under the ADA, 42 U.S.C. § 12102, and the Rehabilitation Act of 1973, 29 U.S.C. § 705(20).  Ms. Stevens' high blood pressure requires her to visit the Mountain View Center of Sutter Health Palo Alto Medical Foundation where she receives emergency care when her blood pressure is irregular, which can happen suddenly and requires daily monitoring.  She also attends a monthly support group at the medical center where medical professionals and other patients provide resources and support for those diagnosed with chronic fatigue syndrome.  Ms. Stevens' health depends on her living within walking distance of the medical center where she has received life-saving care on multiple occasions, including ongoing treatment for complications arising from a rare genetic condition affecting her spine.  As a result of her numerous disabilities, Ms. Stevens is unable to work and receives Social Security Disability Income.  Because she cannot afford market-rate housing and temporary housing shelters near the medical center do not exist, her only option is to live in an RV near the facility.  Once the OSV Ban is enforced, Ms. Stevens faces uncertainty of whether she will be able to consistently park her home near her medical facility and remain connected to critical support networks.

4

12.     Plaintiff GABRIEL RANGEL JAIME resides in an RV parked on the City's streets.  He moved to Mountain View in 2018 with his wife and three children, ages six (first grade), 11 (fifth grade), and 13 (ninth grade).  Mr. Jaime and his family sought out affordable housing options in Mountain View but were unsuccessful.  As a result, Mr. Jaime's children were unable to enroll in Mountain View schools.  Mr. Jaime currently works at a construction site in Mountain View.  The impending enforcement of the OSV Ban threatens his access to employment.  Once the OSV Ban is enforced, his home will be subject to towing.

13.     Plaintiffs ARMANDO COVARRUBIAS and EVELYN ESTRADA have been Mountain View residents for the past five years, since 2016, and currently reside in an RV parked on the City's streets.  Before the COVID-19 pandemic, they lived in a one-bedroom apartment and were both employed at Mountain View restaurants.  As a result of the COVID-19 pandemic, Mr. Covarrubias and Ms. Estrada lost their restaurant jobs and were forced to move into an RV.  Once the OSV Ban is enforced, their home will be subject to towing.

14.     Plaintiff ALMA ALDACO has resided in the City for more than 24 years, and currently resides in an RV parked on the City's streets.  Ms. Aldaco and her husband moved into an RV in 2015, when they could no longer afford the high rents in Mountain View and no affordable housing options were available.  Ms. Aldaco lives with severe mobility issues from a car accident in 2019, which took the life of her son.  She experiences pain while walking and uses a walker to assist her with her mobility.  She also lives with Post-Traumatic Stress Disorder, anxiety, and depression because she has struggled to cope with the loss of her son.  She receives weekly mental health treatment.  Every month, Ms. Aldaco sees a doctor who provides free medical care for Mountain View residents living in RVs.  Ms. Aldaco cannot work due to her disability and does not have health insurance.  Ms. Aldaco's numerous disabilities make her a qualified individual with disabilities under the ADA, 42 U.S.C. § 12102, and the Rehabilitation Act of 1973, 29 U.S.C. § 705(20).  Ms. Aldaco's daughter attends middle school in Mountain View and her son, who has a developmental disability, goes to a school nearby in East Palo Alto, where he is enrolled in a special needs program.  Both children currently walk to school.  Ms. Aldaco cannot drive them due to her disability, and her husband, the only one in the family who

COMPLAINT                                        Case No.: _____

can drive, has scheduling restrictions with his job.  If the family is forced to move out of their current location, Ms. Aldaco believes her children would not have a way to get to school.  Once the OSV Ban is enforced, her home will be subject to towing.

15.     Defendant CITY OF MOUNTAIN VIEW is a local government agency and subdivision of the State of California.  The City receives federal financial assistance within the meaning of 29 U.S.C. § 794 for programs and activities related to the acts and omissions alleged.  The City enacted both Ordinances that make up the OSV Ban, and through its agents the Mayor, City Council, City Attorney, Police Department, and Police Chief has made clear its intention to enforce the OSV Ban.

## PLAINTIFFS' PROPOSED CLASS

16.     Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and all other persons similarly situated.

17.     The proposed class is defined as "all persons who currently reside, seek to reside, or who have resided in an oversized vehicle within Mountain View between December 18, 2020, (the date that the Narrow Streets Ordinance was passed) and present." (the "Class").

18.     The Class is so numerous that joinder of its members is impracticable.  The City of Mountain View's latest survey of inhabited vehicles found 191 inhabited OSVs.  The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class.  Plaintiffs seek prospective relief from enforcement of Mountain View's OSV Ban.

19.     There is a well-defined community of interest in the questions of law and fact affecting the Class.  The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and include:

> a.   Whether the OSV Ban prevents Named Plaintiffs and Class members from residing in or traveling to the City of Mountain View;
>
> b.   Whether the OSV Ban is justified by a compelling government interest;
>
> c.   Whether the OSV Ban has been narrowly tailored to serve any such compelling government interest;

6

d.  Whether Mountain View intended, through the Ordinances, to banish those persons who are not wealthy enough to own or rent property in Mountain View;

e.  Whether Mountain View intended, through the OSV Ban, to banish disabled people from the city of Mountain View;

f.  Whether Named Plaintiffs and other Class members have any safe housing alternative to sheltering in their oversized vehicles in the City of Mountain View;

g.  Whether by reasons of the facts alleged in this Complaint, the OSV Ban violates one or more of the constitutional and statutory provisions enumerated herein;

h.  Whether Named Plaintiffs and other Class members are at risk that their RV along with their personal belongings will be impounded by the City;

i.  Whether Named Plaintiffs and the other Class members are entitled to equitable relief, including system-wide policy changes to address the constitutional and statutory violations detailed in this Complaint.

20.  Plaintiffs' claims are appropriate for class treatment pursuant to Rule 23(b)(2) because the City has demonstrated its intention to enforce the OSV Ban which is applicable to the Class as a whole, thereby making appropriate final declaratory and injunctive relief respecting the Class as a whole.

21.  Named Plaintiffs' claims are typical of the claims of all other members of the Class.  Defendant's enactment and enforcement of the Narrow Streets Ordinance and the Bike Lanes Ordinance has harmed Named Plaintiffs and members of the Class in ways that are either identical or substantially similar.

22.  Plaintiffs are adequate representatives of the Class defined herein, will fairly protect the interests of the members of the Class, have no interests antagonistic to the members of the Class, and will vigorously pursue this suit via attorneys who are competent, skilled, and experienced in litigating matters of this type.  Class counsel is competent and experienced in

7

litigating large class actions.

23.     A class action is the appropriate and superior method for the fair and efficient adjudication of this controversy.  Prosecuting separate actions would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the City.  Allowing this lawsuit to proceed as a class action will permit the class of similarly situated persons to prosecute their common claims in a single forum simultaneously and efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would entail.

24.     To the extent that any member of the class could afford individual litigation, it would be unduly burdensome to the judicial system.  Concentrating this litigation in one forum will promote judicial economy, consistency, and parity among the claims of individual members of the class.

25.     Plaintiffs know of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

**PLAINTIFFS' PROPOSED DISABILITY SUBCLASS**

26.     Plaintiffs also bring this action on behalf of a subclass, referred to as the "Disability Subclass," which is defined as: "All Class members who have a 'disability' as defined under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102."

27.     The proposed Disability Subclass meets the Rule 23(a) requirement of numerosity based on the high percentage of homeless people who have disabilities.  According to the United States Interagency Council on Homelessness, an estimated 24% of people experiencing homelessness on any given day are people with disabilities who meet the definition of chronically homeless.[4]  These rates are higher for unsheltered homelessness, the category that includes the vehicularly housed.[5]  In 2019, in Santa Clara County, 42% of unsheltered homeless people reported having "Psychiatric/Emotional Conditions," 33% reported having Post-

---

[4] U.S. INTERAGENCY COUNCIL ON HOMELESSNESS, *Homelessness in America: Focus on Chronic Homelessness Among People With Disabilities* (Aug. 2018), available at: https://www.usich.gov/resources/uploads/asset_library/Homelessness-in-America-Focus-on-chronic.pdf.

[5] *Id.*

COMPLAINT                                                              Case No.: _____

Traumatic Stress Disorder, 24% reported having a "Physical Disability" and 10% reported having Traumatic Brain Injury.[6]  Of those who were considered "chronically homeless" as defined by HUD, 64% reported having "Psychiatric or Emotional Conditions," 53% reported having Post-Traumatic Stress Disorder, 41% reported having a physical disability, and 17% reported having a traumatic brain injury.[7]

28.     Questions of law and fact common to all members of the Disability Subclass include, but are not limited to, the following:

  a.   Whether Defendant's enforcement of the OSV Ban discriminates against the Members of the Subclass on the basis of disability; and

  b.   Whether Defendant has failed or refused to provide reasonable modifications of its policies as required under the ADA, 42 U.S.C. § 12132 and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and state laws by failing to provide a process for individuals with disabilities to seek an exemption from enforcement at the location where their RVs are currently parked.

29.     Plaintiffs who have disabilities have claims that are typical of the claims of the Members of the Subclass.  Plaintiffs and Members of the Subclass have been similarly harmed by the OSV Ban's disproportionate impact on people with disabilities and seek similar relief in the form of a process for the Members of the Subclass to seek reasonable modifications of the OSV Ban to exempt them from enforcement.  The claims of the named Plaintiffs with disabilities arise from the same practices and conduct that give rise to the claims of all Members of the Subclass and are based on the same legal theories.

---

[6] Applied Survey Research, 2019 SANTA CLARA COUNTY HOMELESS CENSUS & SURVEY at 9 (Executive Summary p. 2), available at https://www.sccgov.org/sites/osh/ContinuumofCare/ReportsandPublications/Documents/2015%20Santa%20Clara%20County%20Homeless%20Census%20and%20Survey/2019%20SCC%20Homeless%20Census%20and%20Survey%20Report.pdf.

[7] Id. at 35.

COMPLAINT        Case No.: _____

**JURISDICTION AND VENUE**

30.     The Court has jurisdiction over this action pursuant 28 U.S.C. § 1331 and 1343, 42 U.S.C. § 12132 and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States.

31.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiffs' state law claims because those claims are related to Plaintiffs' federal law claims and arise out of a common nucleus of related facts.  Plaintiffs' state law claims are related to Plaintiffs' federal law claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

32.     Venue is proper in the Northern District of California pursuant to 28 U.S.C.§ 1391(b)(2) because Defendant, the City of Mountain View, is within the District, and the unlawful conduct that gives rise to these claims occurred within the Northern District of California.  The relief Plaintiffs seek is within this Court's power to grant.

**INTRADISTRICT ASSIGNMENT**

33.     Intradistrict assignment to the Northern District's San Jose Division is proper because Plaintiffs and Defendant reside in Santa Clara County and the unlawful conduct that gives rise to these claims occurred in Santa Clara County.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**A.     Mountain View's Affordable Housing Crisis**

34.     Mountain View sees itself as a community of innovation.  In recent years, corporate success stories—including IPOs, employee stock options, and high corporate earnings—have brought significant wealth to certain residents of the City.

35.     As a direct result of the increasing affluence of some residents of the City, the costs of living and of housing have increased substantially for all of the City's residents, including those who have not benefitted from the increasing affluence in the City.  In particular, long-term Mountain View residents—who resided in the City before the cost of living increased to its present heights—have been priced out of the market for traditional housing.  Employment opportunities have drawn high-income individuals to the area and, as a result, the demand for

10

COMPLAINT                                                    Case No.: _____

rental housing in Mountain View has increased dramatically.

36.     Mountain View has failed to adequately address the growing need for affordable housing for its long-term and lower-income residents, resulting in an affordable housing crisis. As of October 2020, the HUD Fair Market Rents for a one-bedroom in Santa Clara County was $2,558, a 10% increase from the previous year.  Median rents in Mountain View are even higher. Currently, the average rent for a one-bedroom apartment in Mountain View is $2,719.  To afford the average one-bedroom rent in Mountain View, a tenant must make nearly $100,000 a year.

37.     Mountain View is far behind on meeting the housing development goals listed in its 2015-2023 Housing Element for units affordable to very-low income and low-income individuals.  The City's current Regional Housing Needs Assessment (RHNA) allocation requires Mountain View to build 814 units affordable for Very Low-Income households, and 492 units affordable for Low-Income households, by 2023.  Although over halfway through the current cycle, the City's 2020 Annual Housing Element Report indicates that Mountain View built only 26.8% of its Very Low-Income housing units and 43% of its Low-Income housing units.  In stark contrast, the City is far exceeding its RHNA allocation for Above Moderate housing development.  Indeed, Mountain View has already built 345% of its RHNA allocation for market rate units since 2015.

38.     The lack of affordable housing has directly increased homelessness in Mountain View.  The number of unhoused residents has steadily risen for the past several years.  The 2019 Point-in-Time Census, a federally required annual count of Santa Clara County's unhoused population, reported a 46% increase in homelessness over a two-year period.  The census further indicated that a majority of unhoused residents were living in the County prior to becoming homeless.  On March 19, 2019, the City adopted Resolution No. 18301, declaring a shelter crisis, which was later extended until June 30, 2022 by Resolution No. 18462.  While in effect, this declaration allows the City to use public facilities for temporary housing without requiring strict compliance with state and local health and safety standards.  The City could thus choose to allow Mountain View public streets to be used as a sheltering option while the declaration is in effect.

39.     The number of County residents living in cars and recreational vehicles has been increasing in recent years, up 10% from 2017 to 2019.  Since 2017, Mountain View has conducted its own street-by-street counts of persons appearing to be living in vehicles in the public right-of-way.  Over the past three years, the number of vehicles showing signs of human habitation ranged from 250 to 300 vehicles, with the most recent count in July 2020 finding 265 inhabited vehicles.  Of the 265 inhabited vehicles counted in July 2020, 191 of those were RVs used for human habitation; though more recent data suggests that number is conservative.

**B.     Mountain View Enacted the OSV Ban Under the Pretext of "Traffic Safety" in Order to Expel Indigent Populations**

40.     The two Ordinances comprising the OSV Ban, the Narrow Streets Ordinance and Bike Lanes Ordinance, both state that a vehicle violating these Ordinances will be removed from the public right-of-way at the owner's expense as soon as signage is posted.  On October 9, 2018, the City passed Ordinance 13.18 which amended Chapter 19, Article I, Section 19.21 of the Mountain View City Code to expressly give Mountain View Police Department the authority to tow any vehicle parked in violation of a parking prohibition, with only signage as notice.

41.     The City's hostility toward RVs has been steadily climbing over the past several years.  First, Mountain View began increasing enforcement of parking ordinances that target the City's vehicle residents, such as an ordinance that requires vehicles parked on a street to be moved at least every 72 hours.  For example, while only 69 72-hour move violation citations were issued by the Mountain View Police Department from 2015 to 2016, that number increased to 328 from 2016 to 2017.  Most of these citations were given to individuals living in RVs.

42.     Additionally, 746 RVs were towed and impounded from 2015 to 2019 for a variety of parking violations.  To claim an impounded vehicle, the owner must correct any outstanding violations, including unpaid parking tickets, expired registrations and penalties, and make sure the vehicle complies with smog requirements.  Typically, one would need to pay over $1,000 to reclaim a towed vehicle.  For example, Ms. Navarro's RV was towed in 2018 and transported to the impound lot.  She was forced to pay approximately $1,200 to retrieve it.

43.     In March 2019, the City Manager's Office recommended that the City consider a ban on the parking of all OSVs.  At the March 19, 2019 City Council meeting, in response to a question from Councilmember Ramirez, a Mountain View police officer stated that he heard from RV residents that law enforcement officers in surrounding cities, particularly Sunnyvale, Palo Alto, Los Altos and Milpitas, had directed the RV residents to come to Mountain View to take advantage of its supposedly more lenient stance on parking enforcements towards RVs.  A Councilmember remarked that because of the lack of services for the homeless community in the surrounding cities, residents were coming to Mountain View to park their RVs.  Vice Mayor Abe-Koga stated that the ban needed to be city-wide, and not just limited to specified streets, because of "fairness."  During this discussion, neither Vice Mayor Abe-Koga nor the Council cited any specific traffic safety data to justify a ban on OSV parking.

44.     Despite resounding opposition during public comment and the submission of a letter from the Law Foundation of Silicon Valley ("Law Foundation"), the American Civil Liberties Union Foundation of Northern California ("ACLU-NC") and Disability Rights Advocates ("DRA") that raised the many constitutional problems with enacting an OSV ban, the City directed its staff to draft a city-wide OSV ban to be in effect 24 hours a day.

45.     On June 11, 2019, the City Council reconvened to discuss the potential citywide ban.  The discussion focused on homelessness and the RV "issue," with little mention of traffic safety concerns.  For example, Councilmember John McAlister stated Mountain View needed to show the RV residents "tough love" by forcing them to move on from Mountain View if they could not afford fixed housing.  The Council discussed several alternatives to a 24-hour city-wide ban and settled on an overnight ban.  This overnight ban would have prohibited OSV parking from 2 a.m. to 6 a.m. on all City streets.  Tellingly, the Council did not address how banning OSVs from parking between 2 a.m. and 6 a.m.—when traffic is far less frequent— would address any of the safety concerns used as the purported justification for the ban.  Neither did the Council identify any traffic safety concerns to explain why a new citywide, 2 a.m. to 6 a.m. parking ban specific to OSVs was necessary when the City already has an ordinance authorizing City Council to prohibit parking of any vehicle from 2 a.m. to 6 a.m. on any street

13

COMPLAINT                                                    Case No.: _____

designated by resolution.  Mountain View Muni. Code § 19.71.  At this meeting, the Council also directed staff to bring back to council restrictions surrounding parking near parks, bike and pedestrian corridors, and residential zoning.  However, instead of proposing an overnight parking ban, City staff proposed the Narrow Streets Ordinance and Bike Lanes Ordinance.

46.     On September 24, 2019, the City passed the Narrow Streets Ordinance, Ordinance No. 15.19, which added Chapter 19, Article VIII, Division 3, Section 19.79.4 to the Mountain View City Code.  Subject to certain exceptions, the Narrow Streets Ordinance prohibits parking of an oversized vehicle on streets less than or equal to 40 feet in width ("narrow streets").  This new definition of "narrow streets" was arbitrary and not based on data regarding traffic safety issues.  Neither the Narrow Streets Ordinance nor the City's staff reports cites any specific data of increased accidents on narrow streets caused by parked oversized vehicles.  The Ordinance merely states that oversized vehicles could create a hypothetical danger.  In addition to parking penalties, the Narrow Streets Ordinance stated that vehicles parked in violation of that ordinance may be towed and stored at the owner's expense.  The City amended Chapter 19, Article I, Section 19.1 of the Mountain View City Code to define an "Oversized Vehicle" as any vehicle which exceeds twenty-two (22) feet in length, or seven (7) feet in width, or seven (7) feet in height.

47.     At the same Council meeting on September 24, 2019, the City also passed the Bike Lanes Ordinance, Ordinance No. 14.19, which added Chapter 19, Article VIII, Division 3, Section 19.79.3 to the Mountain View City Code.  The Bike Lanes Ordinance banned oversized vehicles from parking on any streets with Class II Bikeways.  In addition to parking penalties, the Bike Lanes Ordinance stated that vehicles parked in violation of the ordinance may be towed and stored at the owner's expense. Neither the Bike Lanes Ordinance nor the staff report submitted to the City Council in support of it cites any specific data of increased bicycle accidents in bike lanes caused by parked oversized vehicles.  The Bike Lanes Ordinance merely states that OSVs could create a hypothetical danger.

48.     The Law Foundation and the ACLU-NC drafted a letter to the City Council and testified at the September 24, 2019 City Council meeting regarding the constitutional concerns

COMPLAINT                                                    Case No.: _____

raised by these iterations of the oversized vehicle ban.  Shortly after the second reading of the Narrow Streets Ordinance, community organizers began collecting signatures for referendum on the Ordinance.  By December 2019, the petition for referendum was successful and garnered 4,939 signatures, well over the 3,761 needed.  On January 2020, the City Council passed a resolution accepting the Referendum Petition against the Narrow Streets Ordinance.

49.     Under the California Constitution, the City had the option to repeal the Narrow Streets Ordinance or submit it to a vote of the electorate.  Rather than repealing the Ordinance, the City Council passed a resolution setting the Narrow Streets Ordinance for a referendum election at the next general election on November 3, 2020.  The Narrow Streets Ordinance appeared on the ballot as Measure C.  The ballot question stated:

> *"Shall City of Mountain View Ordinance 15.19, which prohibits parking of oversized vehicles (such as recreational vehicles, boats and large trucks) except wheelchair-accessible vans with a valid disabled placard and those exempted for short duration activities (such as loading and unloading, and emergency vehicles) on narrow street 40 feet or less in width, be adopted?"*

50.     Measure C passed, with a majority of Mountain View residents voting in favor of the Narrow Streets Ordinance.  On December 8, 2020, the City Council certified the results of the election.

51.     On December 8, 2020, the City passed a resolution designating which streets would qualify as "narrow" under the Narrow Streets Ordinance.  As a result of this resolution and taken in conjunction with the Bike Lanes Ordinance, the OSV Ban applies to 471 of the 525 total public streets, or approximately 89% of the streets in Mountain View.  Of the other 11% of streets, many are unavailable as parking options.  For example, many streets shown on the map, such as Independence Avenue, Pear Avenue, and Grant Road, have "No Parking" signs or signs prohibiting parking between 2 a.m. and 6 a.m., which require those living in RVs to drive around looking for alternative parking during those hours, which could be a health and safety hazard.  Others do not allow any parking at all, such as Central Expressway and Highway 237.  Others

COMPLAINT                                                                 Case No.: _____

have multiple driveways or are filled with single family homes, such as Begen Avenue and Clark Avenue, leaving little space on the street for an OSV to park.  Other streets not covered by the OSV Ban are near corporations such as Space Park and Stierlin Court and are often used to park corporate buses.  The City continues to add parking restrictions on the 11% of available streets. As recently as June 22, 2021, the City Council proposed adding additional Class II Bikeways to Calderon Avenue, further restricting the streets available for RV parking.  Taken together, the Narrow Streets Ordinance and the Bike Lanes Ordinance create an effective city-wide ban on OSV parking.

52.    Signs for the Bike Lanes Ordinance have already been installed.  For the Narrow Streets Ordinance, the City announced in June 2021 that they were preparing for installation of the "no parking" signs in the Monta Loma/Farley/Rock Street neighborhood, to begin in early-to-mid July 2021.  The City's webpage on the Narrow Streets Ordinance[8] indicates that enforcement can begin once signage is installed at the estimated cost of $980,000.

53.    Plaintiffs live in uncertainty regarding how the OSV Ban will be enforced.  The language of the Ordinances sets no warning notice requirements and allows for towing immediately upon violation "[i]n addition to the penalties for parking violations" generally authorized by the City's traffic code.  However, the City's public facing material, including their webpage on the Narrow Streets Ordinance, a June 28, 2021 news release, a November 17, 2020 news release, and The View newsletter from Spring 2021, indicate enforcement will be driven by complaints from the public and will emphasize "education and compliance."  When asked for a list or map of locations where an RV could park in Mountain View without receiving a citation, the City could not produce such a resource.  The City's refusal to clearly indicate where in the City RV residents can park creates confusion for Plaintiffs as to how and where the OSV Ban will be enforced.

54.    An example of the sign that will be posted is included below.  The sign appears to depict a passenger car being towed and includes a telephone number for towed vehicles but

---

8 *Narrow Streets*, THE CITY OF MOUNTAIN VIEW, https://www.mountainview.gov/depts/pw/transport/narrow_streets.asp (last updated June 28, 2021).

COMPLAINT                                              Case No.: _____

otherwise includes very few details.  It does not provide written notice anywhere that a vehicle will be towed if parked in violation.  The sign includes the language "unless exempted" but does not explain how a vehicle or individual could be exempted from the parking ban.



55.     The OSV Ban has serious consequences for Plaintiffs and the individuals they seek to represent.  A violation of either Ordinance may result in a vehicle being removed from the public right-of-way at the owner's expense once signage is posted.  Moreover, the Ordinances do not require any individualized notices or warnings prior to towing, and Plaintiffs will be forced to pay significant fees to remove their homes from impoundments.  Once Mountain View begins to enforce these Ordinances, Plaintiffs will face an impossible, and in some cases life-threatening, choice: risk losing their homes and most of their possessions by staying or be forced out of the City altogether.

56.     Plaintiffs live in constant fear that municipal authorities will soon deprive them of their homes and possessions should they find themselves in violation of the OSV Ban.  Plaintiffs and their children live with this anxiety and stress every day.  When they are unable to pay the heavy fees to remove their homes from impoundment, Plaintiffs will be left with nowhere to go, forcing them to reside unsheltered outdoors.

**C.     Mountain View's "Safe Parking" Program Does Not Adequately Protect Its Residents**

57.     In response to the public outcry over the OSV Ban, in 2019 the City implemented a "Safe Parking Program," which was intended to be a temporary solution to help families bridge

COMPLAINT                                                      Case No.: _____

the gap into permanent housing.  However, the City's Safe Parking Program falls far short of providing enough available and accessible parking spots for Plaintiffs and the proposed class. Furthermore, the Safe Parking Program does not address the injuries that Plaintiffs and the proposed class will suffer merely as a result of attempting to comply with the OSV Ban.

58.    There are currently five Safe Parking sites in Mountain View, all operated by the nonprofit MOVE Mountain View.  In addition to three private lots, there are two City-owned and County-operated lots: Shoreline Amphitheatre Lot B, which is leased to Live Nation and therefore unavailable during the concert season, and Evelyn Avenue.  When all five lots are available, the program can accommodate 67 OSVs and 34 passenger vehicles. Only 4 of these spaces are ADA-compliant, and these spaces are available only at Shoreline and Evelyn.  During the concert season, the 33 spaces (including 2 ADA-compliant spaces) at Shoreline are unavailable.  Even when all spaces are available, the Safe Parking Program is unable to accommodate the approximately 250-300 vehicles in which people reside in Mountain View. The City has never indicated that it will delay, modify, or otherwise refuse to enforce the OSV Ban to enable all Plaintiffs and the proposed class to access the Safe Parking Program.

59.    To get a space in one of these Safe Parking lots, individuals must apply through MOVE Mountain View.  The lots have been at full capacity since March 2020 and there is a waiting list to enter.  The COVID-19 pandemic has exacerbated the crisis, as lots remain full and spaces have not opened.  Individuals who are unable to obtain a spot in a Safe Parking lot have no other option but to park their vehicles on public streets.  Plaintiffs Janet Stevens, Armando Covarrubias, Evelyn Estrada, Gabriel Rangel Jaime, and Alma Aldaco have each attempted to apply for the Safe Parking Program but have never been offered spots in any of the lots or could not pay for the costs to comply with rules related to registration and licensing.  Plaintiff Celerina Navarro has been at the Evelyn Safe Parking lot for about eight months.  Due to the lack of affordable housing in Mountain View, Ms. Navarro has been unable to transition from Safe Parking to permanent housing.  Ms. Navarro faces uncertainty as to how long she will be allowed to stay at Evelyn when the Safe Parking lots begin enforcing durational limits again.  Ms. Navarro and other participants in the Safe Parking program also face great uncertainty as to

18

whether they will be able to keep their vehicular homes if they are forced to transition out of the Safe Parking lot into temporary housing.  For an overwhelming majority of the City's vehicular-housed population, the OSV Ban remains a de facto ban from the City.

      **D.**     **The OSV Ban Disproportionately Harms Those with Disabilities**

      60.     By targeting people who are living in RVs, the City also targets people with disabilities and imposes a disproportionate burden on people with disabilities.  The City has known that the burdens of the OSV Ban would fall heaviest on people with disabilities because Santa Clara County has been noting the correlation between its unhoused population and disabilities in almost every survey of its unhoused populations over the past decade.  For example, the 2019 Point-in-Time survey, a federally required annual count of a County's homeless population, found that in Santa Clara County, 64% of unsheltered homeless people (which includes the vehicularly housed) who are considered "chronically homeless" (see definition below) reported having "Psychiatric or Emotional Conditions," 53% reported having Post-Traumatic Stress Disorder, 41% reported having a physical disability, and 17% reported having a traumatic brain injury.

      61.     The City knows or should know that the federal government has recognized the strong link between homelessness and disability for more than thirty years.  In 1987, Congress passed the McKinney-Vento Homeless Assistance Act of 1987, acknowledging the strong link between homelessness and disability in 1987 with the passage of the McKinney-Vento Homeless Assistance Act of 1987.  Under its delegated authority, the U.S. Department of Housing and Urban Development ("HUD") defines someone as "chronically homeless" if they are an individual with a disability who has been homeless continuously for at least 12 months or on at least four separate occasions in the last three years. 24 C.F.R. § 91.5(1).  A person is deemed homeless if he or she lacks a fixed, regular, and adequate nighttime residence, and includes persons who use RVs or other vehicles for other than temporary living quarters for recreational use. 42 U.S.C. § 11302(a)(1).  The strong link between disability and the loss of fixed housing is typically an economic one.  Many people with disabilities are unable to work due to their disabilities, only work in a limited fashion, or rely on supportive services to find or get to work

COMPLAINT                                              Case No.: _____

sites.  Such is the case for Plaintiffs Celerina Navarro, Janet Stevens, Alma Aldaco, and the Subclass.

62.     Not only do the Ordinances disproportionally impact people with disabilities, but the harm caused by them is exacerbated for people with disabilities.  Compared to non-disabled individuals, those with disabilities face disproportionate harm if they are forced to move into public shelters and onto City streets, or too far away from medical and social support networks.  Those with mental health disabilities risk serious exacerbation of their conditions by losing their private, safe space.  Similarly, those with disability-related immune system vulnerabilities are at a greater risk for infection and serious illness. Further, the stress of attempting to comply with the OSV Ban disproportionately impacts people with mental health disabilities and those with compromised immune systems.

63.     The OSV Ban disrupts the ability of those with disabilities to rely on their vehicular homes to help manage their disabilities and avoid health risks.  For impoverished Plaintiffs with disabilities, vehicular homes are the lifeline to maintain a routine and a regular diet—both of which are crucial for successfully managing disabilities including ADD, diabetes, and bipolar disorder.  Vehicular homes also enable disabled individuals to locate their dwelling near vital services such as medical offices, family in Mountain View who provide care and support, or nonprofit service providers.  Accordingly, for disabled Plaintiffs Navarro, Stevens, and Aldaco, losing their vehicle and having to live unsheltered on the street would gravely jeopardize their already vulnerable mental and physical health.  The OSV Ban's disproportionate harm on individuals with disabilities will be compounded so long as it is in place.

**E.  Mountain View Has Failed to Accommodate Plaintiffs' Disabilities**

64.     Both before and after the passage of the Ordinances, Plaintiffs' counsel notified Defendant about the OSV Ban's disproportionate impact on people with disabilities and the need for reasonable modifications in several letters sent to the City.  Those letters to the City were dated May 7, 2019, September 5, 2019, September 24, 2019, January 14, 2020, and June 7, 2021.  These letters were followed by other communications with the City, warning the City that the Ordinances, if enacted and after enacted if enforced, would unduly burden Mountain View

COMPLAINT                                                  Case No.: _____

residents with disabilities living in oversized vehicles and discriminate against them on the basis of disability.  Despite these letters and advocacy, Defendant has refused to modify its policies and is proceeding with enforcement.  In enforcing the Ordinances without any process through which disabled individuals may request reasonable modifications of the OSV Ban, the City guarantees that members of the proposed subclass will suffer the injuries associated with attempting to comply with the ban.

### CLAIMS FOR RELIEF
### FIRST CAUSE OF ACTION
**Excessive Fines**
[Eighth and Fourteenth Amendments; 42 U.S.C. § 1983]

65.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

66.     The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII. Specifically, the Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense."  *Austin v. United States*, 509 U.S. 602, 609-610 (1993); *Pimentel v. City of L.A.*, 974 F 3d 917, 921 (9th Cir. 2020).  A fine is unconstitutionally excessive if it is grossly disproportionate to the gravity of the offense, will deprive the offender of their livelihood, or is more than their circumstances and estate will bear. *See Timbs v. Indiana*, 139 S. Ct. 682 (2019).  Imposing fines upon indigent individuals without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution.  *See Bearden v. Georgia*, 461 U.S. 660, 667–68 (1983); *People vs. Duenas*, 30 Cal. App. 5th 1157, 1168 (2019).

67.     Defendant has violated the Eighth Amendment Excessive Fines Clause by enacting the Ordinances comprising the OSV Ban, which impose unlimited fines on violators and authorize the City to tow a vehicle upon a single violation of either Ordinance.  The Ordinances require persons who violate them to pay parking penalties of $65.00 for each violation, including late fees, and authorize the City to impound vehicles at the owner's expense, which can be up to thousands of dollars and would be so cost-prohibitive that many OSV

21

COMPLAINT                                                          Case No.: _____

1  dwellers would be unable to get their vehicles back after they have been towed.  The Ordinances

2  impose no limits on the total amount of parking citations the City can issue or the number of

3  times the City can tow and impound a vehicle.  The Ordinances also create no exemptions for

4  those who cannot afford to pay these penalties.

5        68.    The penalties are grossly disproportionate to the gravity of the offense because

6  they require Plaintiffs, who already cannot afford to pay rent or a mortgage in the City and must

7  live in oversized vehicles, to pay exorbitant amounts to maintain their home.  If Plaintiffs cannot

8  afford to pay these penalties, they lose their only means of shelter and face the risk of living

9  unsheltered on the streets, and in some cases, access to life-saving medical care and protection

10  from the elements, which will effectively increase their chances of illness.  Plaintiffs would have

11  to sacrifice paying for other necessities, including food and medication if they are forced to pay

12  these penalties.

13        69.    Because the OSV Ban penalizes low-income individuals with unending parking

14  tickets, towing fines, and impoundment fees in order to maintain their only form of shelter, it

15  violates the Excessive Fines Clause.

16

17  **SECOND CAUSE OF ACTION**
**Excessive Fines and Fees**

18  [Article I, § 17 of the California Constitution]

19        70.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as

20  though fully set forth herein.

21        71.    Under Article I, § 17 of the California Constitution, "Cruel or unusual punishment

22  may not be inflicted or excessive fines imposed."

23        72.    For the same reasons set forth above with respect to the Eighth Amendment of the

24  U.S. Constitution, the OSV Ban also violates Plaintiffs' rights under Article I, § 17 of the

25  California Constitution.

26

27

28

22

**THIRD CAUSE OF ACTION**
**Violation of Substantive Due Process—State Created Danger**
[Fourteenth Amendment; 42 U.S.C. § 1983]

73.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

74.     Under the Fourteenth Amendment, the state deprives a person of a substantive due process right if it "affirmatively place[s] the plaintiff in a position of danger." *Wood v. Ostrander*, 875 F. 2d 578, 589 (9th Cir. 1989).  In examining whether a state official affirmatively places an individual in danger, the Court does not look solely to the agency of the individual or what actions may have been available to the individual.  Instead, "[t]he court must consider whether the officers left the person in a situation that was more dangerous than the one in which they found him."  *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000).

75.     The OSV Ban authorizes the City to issue parking citations to Plaintiffs, and to tow and impound their vehicles, effectively evicting Plaintiffs from their homes and, potentially, from their City.  Towing of Plaintiffs' OSVs deprives them of their shelter and forces them into dangerous situations such as living unsheltered on the streets.  Without access to their OSVs, Plaintiffs cannot access necessities, including food, water, electricity, secure sleeping accommodations, protection from the elements, and medical care.

76.     In addition, the ever-present threat presented by the OSV Ban—that one's home and only source of shelter, together with all of one's possessions, could at any moment be taken away—creates a heightened level of stress and anxiety among persons who are already confronted with the significant challenges posed by their poverty.

77.     For Plaintiffs with disabilities, this situation is even more dangerous. Homelessness creates new health problems and exacerbates existing health conditions.[9]  Without access to a place to safely store medications, chronic health conditions like high blood pressure,

---

[9] National Health Care for the Homeless Council, *Homelessness & Health: What's the Connection?*, (February 2019), *available at* https://nhchc.org/wp-content/uploads/2019/08/homelessness-and-health.pdf

COMPLAINT                                                     Case No.: _____

diabetes and asthma can become worse.[10]  In addition to deterioration of physical health,

homelessness can also lead to an increase in behavioral health issues, like depression.[11]  All

Plaintiffs, and especially Plaintiffs with disabilities, face risk of severe health conditions should

they be evicted from their homes and forced to live on the streets, in encampments or shelters, or

in overcrowded housing situations.

78.     Defendant is aware of these repercussions and specifically intended the OSV Ban

to force Plaintiffs out of the City, with little regard for the catastrophic consequences of

depriving individuals of access to their schools, jobs, medical care, and community resources.

79.     But for Defendant's actions, Plaintiffs would not face these highly dangerous

situations.  Defendant knew or reasonably should have known that its actions of ticketing and

towing Plaintiffs' only form of shelter, together with the ever-present threat that it could do so,

would place them in grave danger.

**FOURTH CAUSE OF ACTION**
**Unlawful Seizure of Property by Towing**
[Fourth Amendment; 42 U.S.C. § 1983]

80.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as

though fully set forth herein.

81.     The Fourth Amendment protects against the "right of the person to be secure in

their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

Const. amend. IV.  Towing a vehicle constitutes a "seizure" invoking the protection of the Fourth

Amendment.  *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005).

82.     The Ninth Circuit requires "individualized notice" before vehicle towing, which is

not satisfied by merely posting signage on a City street.  "Due process requires that

individualized notice be given before an illegally parked car is towed unless the state has a

'strong justification' for not doing so."  *Clement v. City of Glendale*, 518 F.3d 1090, 1094 (9th

Cir. 2008); *see also Grimm v. City of Portland*, 971 F.3d 1060, 1063–64 (9th Cir. 2020)

---

10 *Id.*
11 *Id.*

COMPLAINT                                    Case No.: _____

("*Clement* held that imposing the burdens associated with a towed car without providing notice 'cannot be justified as a means of deterring illegal parking.'").

83. The fundamental right to be free from unreasonable searches and seizures under the Fourth Amendment is subject only to a few exceptions. Among these exceptions is the "community caretaking doctrine." According to this doctrine, police may impound vehicles that "jeopardize public safety and the efficient movement of vehicular traffic." *South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976); *United States v. Jensen*, 425 F.3d 698, 706 (9th Cir. 2005). Here, the community caretaking doctrine cannot apply where Plaintiffs' vehicles are: (1) not blocking traffic, (2) parked against the curb, (3) not otherwise obstructing traffic or bike lanes, (4) not abandoned, and (5) properly registered. Mere noncompliance with a city ordinance or state statute does not justify impoundment under the community caretaking doctrine. *Miranda*, 429 F.3d at 864-65; *United States v. Cervantes*, 703 F.3d 1135, 1142 (9th Cir. 2012).

84. The OSV Ban does not justify towing by the Mountain View Police Department under the Fourth Amendment. Although the Ordinances are purportedly premised on traffic safety, the City did not analyze any street to determine whether parking an oversized vehicle would be a public safety concern or impede traffic. The City set an arbitrary street width for the Narrow Streets Ordinance. Rather than relying on data, the City made a blanket assumption that any oversized vehicle parked on any street with a Class II bikeway or a street 40 feet wide or less automatically creates a traffic safety concern. Neither the Narrow Streets Ordinance nor the Bike Lanes Ordinance states that any individualized assessment of safety will occur prior to towing.

85. The Ordinances additionally fail to provide individualized notice of towing, by stating only that any vehicle found in violation of the Ordinances shall be subject to towing once signs have been posted on the affected streets. The Ordinances do not list any required action by the City prior to towing of the vehicle.

86. Plaintiffs' Fourth Amendment right to be free from unreasonable seizure will be violated upon enforcement of these Ordinances.

25

COMPLAINT                                        Case No.: _____

**FIFTH CAUSE OF ACTION**
**Unlawful Seizure of Property by Towing**
**(Article I, § 13 of the California Constitution)**

87.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

88.     Under Article I, § 13 of the California Constitution, all persons have the right "to be secure in their persons, houses, papers and effects against unreasonable searches and seizures …"  Additionally, "any removal of a vehicle is a seizure under the Fourth Amendment of the Constitution of the United States and Section 13 of Article I of the California Constitution…" Vehicle Code § 26650(b).

89.     For the reasons set forth above with respect to the Fourth Amendment of the U.S. Constitution, the OSV Ban violates Plaintiffs' rights under Article I, § 13 of the California Constitution.

**SIXTH CAUSE OF ACTION**
**Right to Privacy**
[Article I, Section 1 of the California Constitution]

90.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

91.     Under Article I, § 1 of the California Constitution, "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

92.     Among the inalienable rights endowed by the California Constitution is the right to privacy, which the California Supreme Court has described as "the right to be left alone.  It is a fundamental and compelling interest.  It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion and our freedom to associate with the people we choose…[t]his right should be abridged only when there is a compelling public need."  *White v. Davis*, 13 Cal. 3d 757, 774-75 (1975) (quotations omitted).

93.     The OSV Ban violates Plaintiffs' privacy rights under the California Constitution including by threatening their homes, their families, and their emotions, which are each

COMPLAINT                                                    Case No.: _____

safeguarded by this inalienable right.  The potential seizure of one's homes, i.e. the towing of Plaintiffs' vehicles, is incredibly violative of the "right to be left alone" that the California Constitution endows.  Plaintiffs have been subjected to the constant fear that they will be fined, made homeless and/or forcibly removed from the City for the mere act of parking on its streets. There is no compelling public need for the OSV Ban, which infringes on Plaintiffs' inalienable right to privacy under the California Constitution.

<u>**SEVENTH CAUSE OF ACTION**</u>
**Right to Travel/Free Movement**
[Fourteenth Amendment of the U.S. Constitution]

94.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

95.     Throughout our nation's history, residents of all states have "possessed the fundamental right, inherent in citizens of all free governments, [to] peacefully dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom …."  *United States v. Wheeler*, 254 U.S. 281, 293 (1920). The fundamental right to travel and to "peacefully dwell," although not explicitly enumerated in the Constitution, has been consistently recognized by the courts and has been found to be embedded within the Commerce Clause (Article I, § 8) and the Privileges and Immunities, Due Process, and Equal Protection Clauses of the Fourteenth Amendment.  Although sometimes referred to in shorthand fashion as a "right to travel" or "right to freedom of movement," this fundamental right encompasses not only both intrastate and interstate travel, but also the right to remain free from disturbance, in the place where one has arrived.

96.     Because the right of freedom of movement is a fundamental right under the Equal Protection Clause of the 14th Amendment to the U.S. Constitution, any ordinance restricting exercise of that right is "presumptively invidious" and invalid unless the government can prove that the restriction has been "precisely tailored to serve a compelling governmental interest." *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).  Here, the OSV Ban serves no compelling governmental interest; in fact, it was established to expel from the City those who cannot afford permanent residences in Mountain View and who sleep in vehicles as a result.  Even if the City

COMPLAINT                                                                    Case No.: _____

had a compelling interest—which it does not—it failed to take efforts to precisely tailor the OSV Ban to serve such an interest, as would be required.

97.     The OSV Ban violates Plaintiffs' and class members' fundamental right to free movement by targeting Plaintiffs and seeking to banish them from the City based on their lack of fixed housing and socioeconomic status.  The OSV Ban impermissibly prevents Plaintiffs and class members from peacefully dwelling in the place of their choosing.  The OSV Ban also denies Plaintiffs and class members their right to use City property that is designed for the purpose for which Plaintiffs seek to use it, namely, parking their vehicles on public roads that are intended for parking.  By displacing this vulnerable population, the OSV Ban threatens the health and safety of Plaintiffs and deprives them of critical City resources.

**EIGHTH CAUSE OF ACTION**
**Right to Travel/Free Movement**
[Article I, §§ 7(a) and 24 of the California Constitution]

98.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

99.     The California Constitution, Article I, §§ 7(a) and 24, protects the right to travel, or freedom of movement.  "[T]he right to intrastate travel (which includes intramunicipal travel) is a basic human right … implicit in the concept of a democratic society … This personal liberty consists in the power of locomotion, of changing situation or moving one's person to whatever place one's inclination may direct, without imprisonment or restraint."  *In re White*, 97 Cal. App. 3d 141, 148 (1979) (internal citations omitted).

100.    Because the right of freedom of movement is a fundamental right under the Equal Protection Clause of the California Constitution, any ordinance restricting exercise of that right "should be regarded with skepticism.  If available alternative means exist which are less violative of the constitutional right and are narrowly drawn so as to correlate more closely with the purposes contemplated, those alternatives should be used."  *Id.* at 150.  The OSV Ban serves no compelling governmental interest and in fact, was established to banish from the City those residents who cannot afford permanent housing in Mountain View and thus sleep in their vehicles.

28

## NINTH CAUSE OF ACTION
### Violation of the Americans with Disabilities Act
[42 U.S.C. § § 12132, et seq]
(On Behalf of Plaintiffs Celerina Navarro, Janet Stevens, Alma Aldaco, and Members of the Subclass)

101.     Plaintiffs Celerina Navarro, Janet Stevens and Alma Aldaco ("Plaintiffs with disabilities") incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

102.     Defendant is a public entity within the meaning of Title II of the Americans with Disabilities Act. 42 U.S.C. § 12131.

103.     Plaintiffs Celerina Navarro, Janet Stevens and Alma Aldaco are qualified individuals with disabilities under the Americans with Disabilities Act. 42 U.S.C. § 12132; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

104.     Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C § 12132.

105.     Under the ADA, a "program, service, or activity" includes within its scope "anything a public entity does." *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014) (citation omitted); *see also Barden v. City of Sacramento*, 292 F.3d 1073, 1076-77 (9th Cir. 2002) (discussing rationale for broad construction).

106.     Defendant's policies and practices related to OSVs, as well as the amenities of city life offered to its residents are "services, programs or activities" of Defendant City.

107.     The ADA protects people with disabilities against facially neutral policies that burden people with disabilities more than non-disabled people, by requiring the public entity provide reasonable modifications to avoid discrimination unless the public entity can demonstrate such modifications would result in a fundamental alteration of the program. 28 C.F.R. § 35.130(b)(7); *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996).

108.    Reasonable modifications can adjust for the financial limitations that arise from a disability, not just the immediate manifestations of the impairment giving rise to the disability. *Giebeler v. M & B Associates*, 343 F. 3d 1143, 1152 (9th Cir. 2003).

109.    Title II regulations interpreting the ADA prohibit a public entity from utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability. 29 C.F.R. § 35.130(b)(3).

110.    A public entity is also prohibited from imposing eligibility criteria that screen out or tend to screen out individuals with disabilities from fully and equally enjoying any service, program, or activity. 28 C.F.R. § 35.130(b)(8).

111.    Defendant's policies and practices in administrating their parking programs through threatened ticketing of Plaintiffs with disabilities and members of the Subclass, which threatens them with ticketing and impoundment of their vehicles, and excluding homeless OSV owners from parking anywhere in Mountain View, has the effect of discriminating against and imposing disproportionate burdens on people with disabilities based on their disability, screening out such persons from the benefit of the City's parking program, and denying them meaningful access to benefits and City amenities enjoyed by and available to people without disabilities.

112.    In carrying out Defendant's policies and practices as described herein, Defendant has utilized criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability. 29 C.F.R. § 35.130(b)(3).

113.    The OSV Ban disproportionately burdens Plaintiffs with disabilities and Members of the Subclass.  Plaintiffs with disabilities have pre-existing conditions that make them more vulnerable to unsheltered homelessness if their vehicles are impounded, i.e., heightened medical and mental health risks.  Additionally, Plaintiffs with disabilities face increased hurdles in moving their oversized vehicles and in retrieving them in the event they are towed and impounded.  Plaintiffs with disabilities are more likely to live on fixed income as a result of their disability and therefore are less likely to be able to pay the costs associated with the towing and impounding of their homes.

COMPLAINT                                                    Case No.: _____

114.    In fear of enforcement of these Ordinances, Plaintiffs with disabilities may move out of the City and away from critical medical care.  Policies and practices that prevent people from living near their medical and mental health providers further disproportionately burden people with disabilities who have specialized medical and mental health care needs.

115.    Defendant has acted knowingly and with deliberate indifference to the harm substantially likely to occur. As a direct and proximate result of Defendant's acts and omissions, Plaintiffs have suffered and will continue to suffer injuries for which they have no adequate remedy at law.

116.    Because Defendant's discriminatory conduct is ongoing, declaratory and injunctive relief are appropriate.

117.    Pursuant to 42 U.S.C. § 12133, Plaintiffs with disabilities are entitled to declaratory and injunctive relief, and to recover from Defendants the reasonable attorneys' fees and costs incurred in bringing this action.

## TENTH CAUSE OF ACTION
### Violation of § 504 of the Rehabilitation Act of 1973
[29 U.S.C. § 794]
(On Behalf of Plaintiffs Celerina Navarro, Janet Stevens, Alma Aldaco, and Members of the Subclass)

118.    Plaintiffs Celerina Navarro, Janet Stevens, and Alma Aldaco ("Plaintiffs with disabilities") incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

119.    Defendant City and the City's Police Department receive federal financial assistance to fund City activities.

120.    Section 504 of the Rehabilitation Act of 1973 requires qualified persons with disabilities to be provided with meaningful access to federally funded programs.  In order to assure meaningful access, reasonable modifications may be required unless the recipient of federal funding can demonstrate such modifications would result in a fundamental alteration in the nature of the programs. 29 U.S.C. § 749; 24 C.F.R. §§ 8.3 and 8.4; *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

COMPLAINT                                                      Case No.: _____

121.    Defendant's actions and omissions as stated above have denied the rights of Plaintiffs with disabilities and Disability Subclass members to reasonable modifications, thereby denying them meaningful access to Defendant's parking program and to the amenities the City offers its residents without disabilities, and subjecting them to discrimination on the basis of disability, in violation of section 504 of the Rehabilitation Act.  As a result of Defendant's unlawful acts in violation of the Rehabilitation Act, Members of the Subclass have suffered and continue to suffer injuries.

**ELEVENTH CAUSE OF ACTION**
**Violation of the California Disabled Persons Act**
**[California Civil Code §§ 54–54.3]**
(On Behalf of Plaintiffs Celerina Navarro, Janet Stevens, Alma Aldaco, and Members of the Subclass)

122.    Plaintiffs Celerina Navarro, Janet Stevens, and Alma Aldaco ("Plaintiffs with disabilities") incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

123.    The California Disabled Persons Act incorporates the Americans with Disabilities Act, and states that "a violation of the right of an individual under the Americans with Disabilities Act . . .constitutes a violation of" the CDPA. Cal. Civ. Code § 54.1(d).

124.    Thus, by violating the ADA as alleged in Plaintiffs' Ninth Cause of Action, above, the City is also violating the CDPA.

125.    Plaintiffs are aggrieved and potentially aggrieved by Defendant's acts and omissions, as alleged herein.  Moreover, as a direct and proximate result of those acts and omissions, Plaintiffs have suffered and will continue to suffer injuries for which they have no adequate remedy at law.

126.    Because Defendant's discriminatory conduct is ongoing, declaratory and injunctive relief are appropriate.

COMPLAINT                                                    Case No.: _____

**TWELFTH CAUSE OF ACTION**
**Discriminatory Program**
**[California Government Code §§ 11135]**
(On Behalf of Plaintiffs Celerina Navarro, Janet Stevens, Alma Aldaco, and Members of the Subclass)

127.    Plaintiffs Celerina Navarro, Janet Stevens, and Alma Aldaco ("Plaintiffs with disabilities") incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

128.    California Government Code section 11135 sets forth a nondiscriminatory policy for state programs.  It provides in part that:

> [no] person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

Cal. Gov't Code § 11135(a).

129.    Defendant City and the City's Police Department receive state financial assistance to fund City activities.

130.    It is a discriminatory practice for a recipient of state financial assistance, in carrying out any program or activity, on the basis of disability, "(a) to deny a person the opportunity to participate in, or benefit from an aid, benefit or service; (b) to afford a person the opportunity to participate in or benefit from an aid, benefit or service that is not equal to that afforded others; (c) to provide a person with an aid, benefit or service that is not as effective in affording an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others…(g) to otherwise limit a person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by other receiving any aid, benefit or service resulting from the program activity." 22 Cal. Code Regs. §11154 (a)-(c), (g).

131.    It is also discrimination for a recipient of state financial assistance to utilize criteria or methods of administration that: "(1) have the purpose or effect of subjecting a person to discrimination on the basis of disability; [or] (2) have the purpose or effect of defeating or substantially impairing the accomplishment of the objective of the recipient's program with

33

1  respect to a person with a disability…" 22 Cal. Code Regs. §11154(i).

2      132.   Defendant City was, at all times relevant to this action, and is currently operating

3  or administering a program or activity that receives state financial assistance, within the meaning

4  of Section 11135.

5      133.   Plaintiffs with disabilities are entitled to declaratory and injunctive relief as well

6  as reasonable attorneys' fees and costs incurred in bringing this action.

7  <u>**PRAYER FOR RELIEF**</u>

8      WHEREFORE, Plaintiffs pray that the Court grant them relief as follows:

9      1.   Declare that Defendant's threatened enforcement of the ordinances constituting

10  the OSV Ban, Mountain View Muni. Code §§ 19.79.3 and 19.79.4, against Plaintiffs, or any

11  citing, towing or threatened citation or towing for residing in vehicles on public property,

12  violates Plaintiffs' right to be free from excessive fines, the right to due process, the right against

13  unlawful seizures, the right to privacy, and the right to travel/free movement;

14      2.   Declare that Defendant's threatened enforcement of the ordinances constituting

15  the OSV Ban and threats of citation and towing for residing in vehicles on the public right of

16  way discriminates against Plaintiffs on the basis of disability in violation of the ADA, 42 U.S.C.

17  § 12132, and the Rehabilitation Act, 29 U.S.C. § 794;

18      3.   Issue a preliminary and permanent injunction enjoining Defendant, its officers,

19  employees, assignees, successors, and agents from enforcing the ordinances constituting the

20  OSV Ban, Mountain View Muni. Code §§ 19.79.3 and 19.79.4, through issuing of tickets, or

21  through impoundment of OSVs or other vehicles for such unpaid tickets and further enjoining

22  Defendant against ticketing and towing OSVs in which any persons reside on public streets, until

23  such time that permanent accessible housing that is affordable is made available to these

24  individuals;

25      4.   Issue an order requiring the City to create a process for people with disabilities to

26  seek exemption from enforcement of the OSV Ban on the basis of their disabilities, and/or

27  provide them with priority access to safe parking sites;

28

34

5.      Award to Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a(a)(2)(b), Cal. Civ. Code § 52, and Cal. Civ. Proc. Code § 1021.5;

6.      Award to Plaintiffs costs of suit; and

7.      Order such other and further relief that the Court deems just and proper.


Dated: July 14, 2021

Respectfully Submitted,


Nadia Aziz (SBN 252966)
nadia.aziz@lawfoundation.org
Lauren Carden (SBN 279410)
lauren.carden@lawfoundation.org
Michael Trujillo (SBN 326461)
michael.trujillo@lawfoundation.org
LAW FOUNDATION OF SILICON VALLEY
4 North Second Street, Suite 1300
San Jose, CA 95113
Telephone:   (408) 280-2410
Facsimile:    (408) 293-0106

Thomas Zito (SBN 304629)
tzito@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, California 94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511

/s/ Quyen Ta
Quyen Ta (SBN 229956)
qta@kslaw.com
Arwen R. Johnson (SBN 247583)
arwen.johnson@kslaw.com
Kelly Perigoe (SBN 268872)
kperigoe@kslaw.com
Samuel R. Diamant (SBN 288738)
sdiamant@kslaw.com
Rachel Rubens (SBN 333886)
rrubens@kslaw.com
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
*Pro Bono Counsel*

William S. Freeman (SBN 82002)
wfreeman@aclunc.org
Grayce Zelphin (SBN 279112)
gzelphin@aclunc.org
Brandon Greene (SBN 293783)
bgreene@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437


Deanna L. Kwong (SBN 233480)
deanna.l.kwong@hpe.com
HEWLETT PACKARD ENTERPRISE
6280 America Center Drive
San Jose, CA 95002
Telephone: (650) 258-3307
*Pro Bono Counsel*

*Attorneys for Plaintiffs*

COMPLAINT                                              Case No.: _____