JAMES C. HARRISON, State Bar No. 161958
ROBIN B. JOHANSEN, State Bar No. 79084
MARGARET R. PRINZING, State Bar No. 209482
KRISTEN MAH ROGERS, State Bar No. 274672
SUE VANG, State Bar No. 327655
OLSON REMCHO LLP
1901 Harrison Street, Suite 1550
Oakland, CA  94612
Phone:  (510) 346-6200
Fax:  (510) 574-7061
Email: jharrison@olsonremcho.com
        rjohansen@olsonremcho.com
        mprinzing@olsonremcho.com
        krogers@olsonremcho.com
        svang@olsonremcho.com

KRISHAN S. CHOPRA, City Attorney, State Bar No. 192032
OFFICE OF THE CITY ATTORNEY
500 Castro Street, Suite 300
Mountain View, CA  94041
Phone:  (650) 903-6303
Fax:  (650) 967-4215
Email:  krishan.chopra@mountview.gov

Attorneys for Defendant
City of Mountain View

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CELERINA NAVARRO, JANET STEVENS, ARMANDO COVARRUBIAS, EVELYN ESTRADA, GABRIEL RANGEL JAIME, ALMA ALDACO, and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> THE CITY OF MOUNTAIN VIEW, <br><br> Defendant. | No.:  5:21-cv-05381-NC <br><br> **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:  October 20, 2021 <br> Time:  1:00 p.m. <br> Ctrm:  5 <br> Judge:  Hon. Nathanael M. Cousins |

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ...............................................................................................................1

STATEMENT OF FACTS ...................................................................................................2

I.      THE CITY HELPS ITS HOMELESS AND UNSTABLY HOUSED RESIDENTS ..............2

II.     THE ORDINANCES ADVANCE TRAFFIC SAFETY .................................................3

III.    THE CITY IS IMPLEMENTING THE ORDINANCES LAWFULLY ...............................6

ARGUMENT ....................................................................................................................10

I.      THE PRELIMINARY INJUNCTION STANDARD ....................................................10

II.     PLAINTIFFS ARE NOT AT RISK OF IRREPARABLE INJURY ..................................11

III.    PLAINTIFFS WILL NOT SUCCEED ON THE MERITS OF THEIR CLAIMS ...............13

        A.      Plaintiffs Lack Standing To Seek Injunctive Relief ...................................13

        B.      Towing Under The Ordinances Will Not Violate The
                Fourth Amendment .....................................................................................15

        C.      The City Provides Adequate Notice Prior To Towing ...............................16

        D.      The City's Fines Are Not Excessive ...........................................................18

                1. A $65 parking ticket fine is not excessive ............................................19

                2. Passing on storage and towing costs to those who persistently
                   refuse to move their vehicles is not an excessive fine ........................21

        E.      Plaintiffs Cannot Succeed On Their Right To Travel Claim .....................22

IV.     THE EQUITIES REQUIRE THAT THIS MOTION BE DENIED ....................................24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*18 Unnamed "John Smith" Prisoners v. Meese*, ........................................................................18
  871 F.2d 881 (9th Cir. 1989)

*Aitken v. City of Aberdeen*, ...............................................................................................23
  393 F. Supp. 3d 1075 (W.D. Wash. 2019)

*All For The Wild Rockies v. Cottrell*, ...............................................................................10
  632 F.3d 1127 (9th Cir. 2011)

*Attorney Gen. of N.Y. v. Soto-Lopez*, ................................................................................22
  476 U.S. 898 (1986)

*Bearden v. Georgia*, ...........................................................................................................20
  461 U.S. 660 (1983)

*Blake v. City of Grants Pass*, ............................................................................................18
  No. 1:18-cv-01823-CL, 2020 U.S. Dist. LEXIS 129494 (D. Or. July 22, 2020)

*Cal. Pawnbrokers Ass'n, Inc. v. Carter*, ...........................................................................11
  No. 2:16-cv-02141-JAM-KJN, 2016 U.S. Dist. LEXIS 155100 (E.D. Cal. Nov. 7, 2016)

*Caribbean Marine Servs. Co. v. Baldrige*, .......................................................................10
  844 F.2d 668 (9th Cir. 1988)

*Cheffer v. Reno*, .................................................................................................................18
  55 F.3d 1517 (11th Cir. 1995)

*City of Los Angeles v. Lyons*, ...........................................................................................14
  461 U.S. 95 (1983)

*City of Los Angeles v. Patel*, ............................................................................................13
  576 U.S. 409 (2015)

*City of Seattle v. Long*, .................................................................................................21, 22
  No. 98824-2, 2021 Wash. LEXIS 433 (Wash. Aug. 12, 2021)

*Clement v. City of Glendale*, ........................................................................................16, 17
  518 F.3d 1090 (9th Cir. 2008)

*Davison v. City of Tucson*, ................................................................................................23
  924 F. Supp. 989 (D. Ariz. 1996)

*Disney Enter, Inc. v. VidAngel, Inc.*, ...............................................................................10
  869 F.3d 848 (9th Cir. 2017)

*Dunn v. Blumstein*, ............................................................................................................23
  405 U.S. 330 (1972)

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, .......................................15
  528 U.S. 167 (2000)

*Geary et. al. v. City of Pacifica*, .......................................................................................24
  No. 3:21-cv-01780-VC (N.D. Cal.)

*Grimm v. City of Portland*, ..................................................................................................16
   971 F.3d 1060 (9th Cir. 2020)

*Haynie v. Harris*, ...............................................................................................................15
   No. C 10-01255 SI, 2014 U.S. Dist. LEXIS 28293 (N.D. Cal. Mar. 4, 2014)

*Hooper v. City of Seattle*, ..................................................................................................10
   No. C17-0077RSM, 2017 U.S. Dist. LEXIS 20829 (W.D. Wash. Feb. 14, 2017)

*Horwitz v. Southwest Forest Industries, Inc.*, ..................................................................25
   604 F. Supp. 1130 (D. Nev. 1985)

*Index Newspapers LLC v. U.S. Marshals Servs.*, ..............................................................14
   977 F.3d 817 (9th Cir. 2020)

*Jones v. Flowers*, ...............................................................................................................17
   547 U.S. 220 (2006)

*Joyce v. City & County of S.F.*, .........................................................................................23
   846 F. Supp. 843 (N.D. Cal. 1994)

*K.D. v. Oakley Union Elementary Sch. Dist.*, ...................................................................11
   No. C 07-00920 MHP, 2008 U.S. Dist. LEXIS 9559 (N.D. Cal. Feb. 8, 2008)

*Lone Star & Sec. Video, Inc. v. City of Los Angeles,* .......................................................15
   584 F.3d 1232 (9th Cir. 2009)

*Mem'l Hosp. v. Maricopa County*, .....................................................................................23
   415 U.S. 250 (1974)

*Midgett v. Tri-Cty. Metro. Transp. Dist.*, ..........................................................................10
   254 F.3d 846 (9th Cir. 2001)

*Miranda v. City of Cornelius*, ......................................................................................15, 16
   429 F.3d 858 (9th Cir. 2005)

*Mullane v. Central Hanover Bank & Trust Co.*, ...........................................................16, 17
   339 U.S. 306 (1950)

*Nunez by Nunez v. San Diego*, ...........................................................................................22
   114 F.3d 935 (1997)

*People v. Duenas*, ..............................................................................................................20
   30 Cal. App. 5th 1157 (2019)

*People v. Kopp*, ..................................................................................................................20
   38 Cal. App. 5th 47 (2019)

*People v. Williams*, ............................................................................................................16
   145 Cal.App.4th 756 (2006)

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, ......................................................20
   37 Cal. 4th 707 (2005)

*Pimentel v. City of Los Angeles*, ..................................................................................... 19, 20
　974 F.3d 917 (9th Cir. 2020)

*Publ'n Int'l, Ltd. v. Meredith Corp.*, ........................................................................................ 25
　88 F.3d 473 (7th Cir. 1996)

*Roulette v. City of Seattle*, ........................................................................................................ 23
　850 F. Supp. 1442 (W.D. Wash. 1994)

*S.F. Tech., Inc. v. Dial Corp.*, ................................................................................................... 18
　2011 U.S. Dist. LEXIS 32331 (N.D. Cal. Mar. 17, 2011)

*Shapiro v. Thompson*, ................................................................................................................ 23
　394 U.S. 618 (1969)

*South Dakota v. Opperman*, ...................................................................................................... 13
　428 U.S. 364 (1976)

*Tobe v. City of Santa Ana*, ................................................................................................... 22, 23
　9 Cal. 4th 1069 (1995)

*United States v. Bajakajian*, ............................................................................................... 19, 21
　524 U.S. 321 (1998)

*United States v. Cervantes*, .................................................................................................. 15, 16
　703 F.3d  1135 (9th Cir. 2012)

*Veterans for Peace Greater Seattle v. City of Seattle*, ......................................................... 23, 24
　No. C09-1032 RSM, 2009 U.S. Dist. LEXIS 77040 (W.D. Wash. July 24, 2009)

*Vonderhaar v. Vill. of Evendale*, .............................................................................................. 14
　906 F.3d 397 (6th Cir. 2018)

*Winter v. Natural Res. Defense Council, Inc.*, ..................................................................... 10, 13
　555 U.S. 7 (2008)

## <u>CALIFORNIA STATUTES</u>:

Cal. Veh. Code
　§ 22852 .................................................................................................................................. 21
　§ 40215(a) ............................................................................................................................. 19
　§ 40215(c)(7) ........................................................................................................................ 19

# INTRODUCTION

Through their motion, Plaintiffs seek to prevent the City of Mountain View ("City" or "Mountain View") from implementing laws that protect residents from traffic safety hazards on the basis of speculation and legal theories entirely at odds with the evidentiary record.  Plaintiffs' motion cannot – and should not – prevail.

Mountain View is recognized as a regional leader in creating affordable housing opportunities and groundbreaking programs to support its vulnerable populations.  At the same time, Mountain View is committed to protecting bicyclists, drivers, and pedestrians from the dangers of traffic collisions.  The City has therefore enacted two ordinances that limit parking by all oversized vehicles – not just vehicles used for habitation – because oversized vehicles create traffic hazards when parked on narrow streets and streets with bicycle lanes.

Plaintiffs claim the ordinances "ban" oversized vehicles from parking in the City, and are therefore an effort to expel its low-income population.  Plaintiffs are wrong.  Once both ordinances are fully implemented by February 2022, there will be more than 5.5 miles of wider streets without bicycle lanes with parking for oversized vehicles within the City, as well as parking in the Safe Parking lots the City has established to create better alternatives for people who are forced to live in their vehicles.  Thus, Plaintiffs have no reasonable grounds to fear they will be forced to leave the City.

Nor do Plaintiffs have any reasonable basis to fear tickets or towing.  The City is providing abundant notice of which streets are covered by the Ordinances through, among other things, street signs and individualized notices that the City is personally delivering to the occupants of the oversized vehicles parked on narrow streets.  Furthermore, the police are already working with individuals to ensure they can move to alternative locations in the City long before they face the possibility of a parking ticket or towing.  As Lieutenant Scott Nelson of the Mountain View Police Department testifies in his accompanying declaration, "an oversized vehicle used for habitation will not be towed for violating either of the Ordinances unless the occupant knowingly and persistently over a significant period of time defies an Ordinance."  Plaintiffs therefore cannot prevail because they are not at risk of suffering *any* harm from the enforcement of these ordinances, except perhaps the loss of a preferred parking spot.

1      Plaintiffs' motion also fails on the law.  Their lack of harm translates into a lack of

2  standing to bring these claims.  Furthermore, they cannot establish a Fourth Amendment violation

3  since towing will occur only when the occupant of a vehicle persistently refuses to comply with an

4  ordinance that safeguards public safety, after far more notice than the Constitution requires.  Nor have

5  they brought a meritorious claim for excessive fines given that every person who receives a ticket is

6  entitled to an indigency determination to ensure the cost of a ticket is not more than they can bear.

7  Finally, Plaintiffs cannot succeed on their right to travel claim.  The Constitution does not give

8  Plaintiffs the right to live wherever they wish, and the City is well within is authority to enact laws,

9  like these ordinances, that protect public safety.

10      In short, Plaintiffs' motion has no merit and must be denied.

11                    **STATEMENT OF FACTS**

12  **I.      THE CITY HELPS ITS HOMELESS AND UNSTABLY HOUSED RESIDENTS**

13      Across California, the number of individuals experiencing homelessness and unstable

14  housing has been on the rise.  Decl. of Kimberly S. Thomas in Supp. of Def.'s Opp'n to Mot. for

15  Prelim. Inj. ("Thomas Decl."), ¶ 4.  Mountain View is recognized as a regional leader in developing

16  and funding affordable housing and has implemented innovative programs to provide services and

17  support to those homeless and low-income individuals who live in the City.  *Id.*, ¶ 3.  In the last five

18  years, "the City has invested over $9.9 million to address homelessness and has committed over $104

19  million . . . to fund affordable housing."  *Id.*, ¶ 4.  The City has also implemented innovative programs

20  to support and help keep its homeless and low-income residents living in Mountain View, including

21  the Safe Parking Program – one of the largest in the Bay Area –  which provides 101 safe, temporary

22  parking spaces in the City for those living in vehicles to park and access to on-site hygiene, medical

23  services, and case management to transition them into more stable housing.  *Id.*, ¶¶ 5-7 & Ex. C.

24      Additionally, the City provides rent and eviction protection to approximately 15,000

25  rental units under the Community Stabilization and Fair Rent Act voter initiative, has built 1,500

26  affordable housing units, is working to build 750 additional affordable housing units in the near future,

27  and provides rental assistance to low-income residents.  *Id.*, Ex. B at 6, 15-16.

28      The City also provides, in partnership with Santa Clara County, Homelessness

DEF.'S OPP. TO PLFS.' MOT. FOR          2
PRELIM. INJ. – NO. 5:21-cv-05381-NC

Prevention and Rapid Rehousing Programs, and Permanent Supportive Housing to help hundreds of homeless residents. *Id.*, ¶ 5. Most recently, the City opened LifeMoves Mountain View (a State Homekey Project) in May 2021, providing 100 units of interim housing in Mountain View that serve 300-400 individuals who are homeless or unstably housed. *Id.*, ¶ 6. For residents who remain unhoused, the City provides 65 shelter beds in conjunction with the County. *Id.*, ¶ 5.

The City's ongoing investments in these programs – which help keep low-income residents *in Mountain View* (*id.*, ¶¶ 5-7) – reveal that Plaintiffs' central thesis that the City seeks to banish its low-income population is fundamentally untrue.

## II.   THE ORDINANCES ADVANCE TRAFFIC SAFETY

On September 24, 2019, the Mountain View City Council introduced Ordinance No. 14.19 to restrict the parking of oversized vehicles on streets adjacent to Class II bikeways (the "Bicycle Lane Ordinance"), and Ordinance 15.19 to restrict the parking of oversized vehicles on narrow streets (the "Narrow Streets Ordinance," collectively, the "Ordinances"). On October 22, 2019, the Council adopted both Ordinances. Decl. of Michael Trujillo in Supp. of Pls.' Mot. for Prelim. Inj. ("Trujillo Decl."), Ex. O at 4-6; Decl. of Margaret R. Prinzing in Supp. of Def.'s Opp'n to Mot. for Prelim. Inj. ("Prinzing Decl."), Ex. A at 3.

Opponents of the measures promptly qualified a referendum of the Narrow Streets Ordinance, which appeared on the November 3, 2020 Mountain View ballot as Measure C. Class Action Compl. (ECF No. 1), ¶ 48-49. The voters were told that Measure C was developed to address "serious safety concerns about oversized vehicles parking" in the City's neighborhoods because "they make it difficult to see children, walkers, runners, bicyclists, and vehicles . . . ." Prinzing Decl., Ex. C. Nearly 57% of the City's voters approved the Narrow Streets Ordinance. *Id.*, Ex. G at 2.

Both Ordinances declare on their face that they were enacted to "promote the safety of public roadways." Prinzing Decl., Exs. H at 1 & I at 1. They do so in slightly different ways, as the City's Traffic Engineer Lorenzo Lopez explains.

Streets covered by the Bicycle Lane Ordinance have a dedicated bike lane running between the space for parallel parking and the right-of-way for vehicular traffic. Consequently, "when a bicyclist cycles down such a bike lane, she will pass parked cars on one side of the bike lane while

vehicular traffic passes her on the other side of the bike lane." Decl. of Lorenzo Lopez in Supp. of Def.'s Opp'n to Mot. for Prelim. Inj. ("Lopez Decl."), ¶ 4. Before the Ordinance passed, when Mr. Lopez responded to complaints about oversized vehicles obstructing bike lanes, he observed that oversized vehicles parked along such streets necessarily encroached into the bike lanes, thereby forcing bikes into vehicular traffic lane. *Id.*, ¶ 5. As Mr. Lopez attests, "[t]he Bicycle Lane Ordinance clearly advances public safety by ensuring that parked oversized vehicles can no longer force bicyclists out of the bike lane and into the vehicular traffic lane." *Id.*

The Narrow Streets Ordinance addresses traffic safety more broadly by prohibiting the parking of oversized vehicles on any street that is less than or equal to 40 feet in width. Prinzing Decl., Ex. H at 2. Oversized vehicles can be as wide as 102 inches, and most people park approximately 12 inches from the curb. This means an oversized vehicle may need approximately 9.5 feet to park, with its side mirror extending approximately 10 additional inches beyond that. The standard passenger vehicle is up to 7 feet wide, and it requires at least 3 feet of space on each side to safely pass between a parked vehicle and a moving vehicle. Together, this adds up to 21 feet, 10 inches, which means that a standard passenger vehicle passing an oversized vehicle will require more than half the width of a 40-foot street to safely navigate between a parked oversized vehicle and oncoming traffic. Lopez Decl., ¶ 6. This alone is hazardous given that oncoming traffic will have less than half the width of a 40-foot street available to pass, but the hazard increases if there is another oversized vehicle parked on the other side of the street, or if the passing vehicle is wider than the average passenger vehicle. City fire trucks, for example, are 9.7 feet wide (116 inches). Accordingly, as Mr. Lopez attests, "it is clear that the Narrow Streets Ordinance advances public safety." *Id.*

Plaintiffs nevertheless argue that the City used traffic safety as a pretext to "banish" low-income people from Mountain View. Plaintiffs assert the Ordinances cannot address traffic safety because they are "not based on *data* regarding traffic safety issues." Pls.' Mot. for Prelim. Inj. ("MPI") at 7:18-19 (emphasis added). Yet Plaintiffs' focus on "data" is misplaced. As Mountain View's City Traffic Engineer explains, not all traffic safety decisions require data like statistics or engineering models. "If a city were determining how much weight a new bridge could safely bear, or the maximum safe speed limit around a curve in a road, the city would need to consider relevant data in its

1   decision-making process." Lopez Decl., ¶ 3.  A decision about whether it is safe to park oversized

2   vehicles on streets with bike lanes or narrow streets, however, does not require this kind of data.

3   Rather, as the analysis above illustrates, it "requires observation, common sense, and arithmetic." *Id*.

4   Plaintiffs also base their "pretext" argument on a selective use of evidence that

5   allegedly shows the City Council largely ignored traffic safety to focus on its goal of expelling low-

6   income individuals.  MPI at 5:26-9:1.  Nothing about this thesis is correct, however, because (1) the

7   City Council *did* focus on traffic safety; and (2) far from seeking to expel individuals who live in

8   oversized vehicles, the City Council created a Safe Parking Program to provide alternative parking

9   spaces for these individuals *in Mountain View*, in addition to all of the other efforts to help the

10  homeless and unstably housed detailed above.

11  On March 19, 2019, the City Council considered different options for limiting parking

12  by all oversized vehicles, not just oversized vehicles used for habitation.  The City Council Report that

13  informed the debate at that meeting detailed concerns expressed by members of the public that

14  oversized vehicles "reduced motor vehicle safety due to the line-of-sight impacts [and] reduced bicycle

15  and pedestrian safety." Trujillo Decl., Ex. M at 18.  The Report explained that City "[s]taff has

16  assessed traffic safety issues and the need for parking restrictions in areas where large vehicles impede

17  lines of sight for drivers, bikers, and pedestrians." *Id*. at 3.  Council members at the meeting echoed

18  these concerns.  For example, Vice Mayor Margaret Abe-Koga stated that public safety is the "primary

19  concern that I've heard" concerning oversized vehicles.  Prinzing Decl., ¶ 11.

20  The Council Report also noted that the Council had previously "not pursued greater

21  parking restrictions, stating an interest in finding alternative locations for vehicles being used as

22  housing to park." Trujillo Decl., Ex. M at 4.  The Report therefore detailed the City's ongoing efforts

23  to address the needs of its homeless and unstably housed population and presented the Council with

24  options to create new safe parking options.  *Id*. at 2-3, 8-16, 20-25, 38-43.  Although the City Council

25  did not approve any parking restrictions on oversized vehicles at the March 19, 2019 meeting, it did

26  approve new funding for a Safe Parking Program.  Prinzing Decl., Ex. J at 5.

27  Traffic safety issues were also a focus of the other meetings Plaintiffs discuss.  *See, e.g.*,

28  Prinzing Decl., Ex. K at 2-3, 5 (June 11, 2019 City Council Report describes safety concerns posed by

oversized vehicles); Trujillo Decl., Ex. N at 3-4 (September 24, 2019 City Council Report describes dangers of oversized vehicles encroaching into bike lanes and dangers of passing oversized vehicles parked on narrow streets). Plaintiffs fault the City for considering an option at its June 11, 2019 meeting that had a more attenuated link to traffic safety – a prohibition on parking oversized vehicles from 2 a.m. to 6 a.m. – but they neglect to mention that Councilmembers criticized that option precisely because it did not clearly address traffic safety. Councilmember Linda Matichak noted that overnight restrictions are "not addressing the safety issue" while Vice-Mayor Abe-Koga expressed a preference for daytime restrictions because "the real issue with safety is during the daytime when folks are out and about." Prinzing Decl., ¶ 14.

There is no question that the Council also discussed other concerns relating to oversized vehicles parked on City streets. Plaintiffs themselves have introduced evidence that some such vehicles release raw human sewage onto the City's streets even though the City offers services to address the problem. Trujillo Decl., Ex. K at 5-9, 13-16. The fact that Councilmembers are concerned about issues like raw sewage on City streets does not mean they are not also concerned both about traffic safety and the wellbeing of those who are forced to live in oversized vehicles.

Indeed, the City Council ultimately adopted parking restrictions that advance traffic safety. Pp. 3-4 (summarizing evidence). And it did so while *simultaneously* establishing a Safe Parking Program so that residents living in oversized vehicles may safely park *in Mountain View*,[1] disproving Plaintiffs' claim that the Council is secretly planning to expel such residents from the City.

## III.    THE CITY IS IMPLEMENTING THE ORDINANCES LAWFULLY

*Notice.* Plaintiffs attack the City's notice practices, though it is difficult to conceive how the City could reasonably be expected to provide more notice.

First, the City Council passed resolutions on December 3, 2019 and December 8, 2020 identifying which streets are covered by the Ordinances. Trujillo Decl., Exs. Q & S. These lists are available online. *Id.*, ¶¶ 20, 22.

Second, both Ordinances prohibit enforcement until signs "giving adequate notice of the

---

[1] Prinzing Decl., Ex. A at 3.

DEF.'S OPP. TO PLFS.' MOT. FOR    6
PRELIM. INJ. – NO. 5:21-cv-05381-NC

1    restriction" are installed.  Prinzing Decl., Exs. H at 3 & I at 2.  The City has already installed 430 signs

2    notifying the public of the Bicycle Lane Ordinance and is in the process of installing an anticipated

3    1,900 signs notifying the public of the Narrow Streets Ordinance.  Lopez Decl., ¶¶ 9, 12.  Each sign is

4    double-sided so that drivers can see them whether positioned in front of the sign or behind it, and every

5    single block covered by either Ordinance has or will have at least two posted double-sided signs

6    indicating that oversized vehicles cannot park on that block.[2]  *Id.*; *see also id.*, ¶ 8 (describing signs).

7         Third, before installing signs for the Narrow Streets Ordinance, the City is mailing

8    notices to residents and property owners with residential addresses on each narrow street covered by

9    the Ordinance.  Lopez Decl., ¶ 13 & Ex. A.

10        Fourth, also before installing signs for the Narrow Streets Ordinance, a community

11   outreach officer is personally delivering direct notice and information to individuals living in oversized

12   vehicles on streets covered by the Ordinance.  The officer explains the information in person if

13   possible, or leaves flyers explaining the parking restriction and providing information about parking

14   alternatives and other available services, like housing and medical services.  Decl. of Scott Nelson in

15   Supp. of Def.'s Opp'n to Mot. for Prelim. Inj. ("Nelson Decl."), ¶ 3 & Exs. A & B.

16        Fifth, the City has been providing information about the Narrow Streets Ordinance to

17   the media and members of the public through various channels, including a public "Narrow Streets"

18   website,[3] articles in city newsletters, and social media posts.  Thomas Decl., ¶¶ 12 & 13.

19        It would therefore be all but impossible for occupants of oversized vehicles to be

20   unaware of whether the Ordinances are being enforced on the streets where they are parked.

21        ***Tickets and Towing.***  Plaintiffs next claim that enforcement of the Ordinances

22   "threatens Plaintiffs with immediate loss of their homes and all their possessions, in addition to . . .

23   fines and fees they cannot afford."  MPI at 9:19-20.  Nothing could be further from the truth.

24        That much should be apparent from the City's existing record of enforcement.

25   Although the Bicycle Lane Ordinance has been in full effect since December 2020, and the Narrow

26   Streets Ordinance has been in effect in part of the City since August 16, 2021, not one oversized

27   _____

    [2]  The only exception are short cul-de-sacs, which may have one double-sided sign.  Lopez Decl., ¶ 12.
28   [3]  MountainView.gov/NarrowStreets (last visited Sept. 17, 2021).

DEF.'S OPP. TO PLFS.' MOT. FOR              7
PRELIM. INJ. – NO. 5:21-cv-05381-NC

vehicle has been ticketed or towed under either Ordinance.  Lopez Decl., ¶¶ 9, 11; Nelson Decl., ¶ 4.

This is due in part to the fact that the Mountain View Police Department's Neighborhood and Event Services Unit ("NES Unit"), which primarily deals with the City's homeless residents, follows an education and progression approach to address violations of the City's parking ordinances by occupants of oversized vehicles.  Nelson Decl., ¶¶ 2, 5.  The first step in this approach is to provide the occupants with education about the law and outreach describing available services in Mountain View, such as the Safe Parking Program and Project Homekey, a transitional housing program.  If the first conversation does not lead to voluntarily compliance, the NES Unit persists.  As Lieutenant Scott Nelson, the head of the Unit, explains, "[i]t is not unusual for the NES Unit to make a dozen or more visits to an occupant of an oversized vehicle in an effort to help the occupant access services and come into compliance with the law."  *Id.*, ¶ 5.

Only if these efforts fail to bring the occupant into voluntary compliance with the law at issue will the NES Unit issue a written warning – called a "courtesy notification."  Nelson Decl., ¶ 7 & Ex. C.  If the occupant continues to refuse to comply with the law, the NES Unit might issue one or more formal citations.  *Id.*, ¶ 8.  If the occupant still refuses to comply with the law, the NES Unit may tow the vehicle.  *Id.*, ¶ 9.  But even then, the vehicle will not be towed until an officer provides a final (minimum) three-day warning *and* the NES Unit's supervisor agrees that towing is appropriate under the circumstances.  *Id.*  As Lt. Nelson testifies, "an oversized vehicle used for habitation will not be towed for violating either of the Ordinances unless the occupant knowingly and persistently over a significant period of time defies an Ordinance."  *Id.*, ¶ 15.

***Parking Alternatives.***  Plaintiffs claim they will be forced out of the City once the Ordinances are fully implemented (MPI at 10:21-22, 11:8), but the evidence is to the contrary.

The latest count in Mountain View found 191 oversized vehicles being used for habitation as of July 2020.  Trujillo Decl., Ex. C at 3.  Some of these individuals have likely found more stable housing options since then, perhaps with LifeMoves Mountain View which opened in May 2021 to provide 100 units of interim housing, or the Safe Parking Program, which helps many of its participants move on to more stable options.  Thomas Decl., ¶¶ 6, 10.

Yet even assuming that each of these vehicles will need alternative parking, more than

1    one-third of them – 68 total vehicles – can park in one of the City's Safe Parking spaces reserved for

2    oversized vehicles.[4]  *Id*., ¶ 7.

3            The remaining 123 oversized vehicles can seek spaces on other City streets.  To

4    determine how much parking will be available, the City Traffic Engineer analyzed those street

5    segments that are not covered by the Ordinances.  Using a combination of Google Street View and

6    street visits, Mr. Lopez eliminated street segments that (1) have recently added Class II bikeways;

7    (2) have no shoulder space available for parking; and (3) have signs restricting parking.  Lopez Decl.,

8    ¶¶ 14-15.  After these street segments were eliminated, Mr. Lopez identified 34 remaining street

9    segments that will be available for oversized vehicle parking when both Ordinances are in full effect.

10   "These 34 street segments together yield approximately 29,000 feet or around 5.5 miles of streets

11   where oversized vehicles will be able to park." *Id*., ¶ 17.  Although some of these segments have

12   parking limitations on "one side of the street, most allow parking on both sides of the street." *Id*.

13           These street segments can be expected to provide more than enough parking spaces for

14   the remaining 123 oversized vehicles.  An oversized vehicle is defined in Mountain View's City Code

15   as exceeding twenty-two feet in length.  Prinzing Decl., Ex. H at 2.  Assuming that an oversized

16   vehicle requires an average of 30 feet to safely parallel park, a single mile of available street space

17   (5,280 feet) could theoretically accommodate 176 such vehicles on one side of the street alone, while

18   5.5 miles of available street space (29,000) could theoretically accommodate 966 oversized vehicles on

19   one side of the street alone.  Although some of this space will not actually be available for parking

20   because of barriers like fire hydrants and driveways, the fact that most of these streets provide parking

21   space on both sides of the road indicates that even more than 5.5 miles of street segments will be

22   _____

23   [4]  Plaintiffs struggle to portray the Safe Parking program as inadequate.  MPI at 9 n.2.  They call it
     "temporary," but the City is working to expand the program, and has already negotiated access to one
     lot through 2022, another through 2023, and another through 2025.  Thomas Decl., ¶ 11.  They note

24   that some Plaintiffs have been unable to secure spots, but the declarations reveal little effort to do so.
     Alma Aldaco concedes she was offered a spot but gave it up because she did not have registration tags,

25   even though she also needs registration tags to park on the street.  Decl. of Alma Aldaco ("Aldaco
     Decl."), ¶ 18.  Three Plaintiffs called several times, but Janet Stevens did not bother to return the call-

26   back she received to see if there was an opening.  Decl.of Armando Covarrubias, ¶ 6; Decl. of Gabriel
     Rangel Jaime, ¶ 4; Decl. of Janet Stevens ("Stevens Decl."), ¶ 11.  Several Plaintiffs have rejected the

27   lots because they believe they have restricted hours, but the three City lots offer 24/7 parking.
     Thomas Decl., ¶ 9.  In short, Plaintiffs may well be able to secure safe parking spots.  Although the lots

28   are popular, there is turnover.  *Id*., ¶ 9.

1    available for potential parking spots.

2          Indeed, this analysis is consistent with the City's experience under the Ordinances.

3    Although the Bicycle Lane Ordinance has been in full effect for nine months, Plaintiffs do not suggest

4    anyone has had to move out of the City as a consequence.  Furthermore, Lt. Nelson confirms that

5    oversized vehicles that have recently had to relocate under the Narrow Streets Ordinance have found

6    new parking spaces on a nearby street that is not covered by the Ordinances.  Nelson Decl., ¶ 11.

7    <u>**ARGUMENT**</u>

8    **I.**    <u>**THE PRELIMINARY INJUNCTION STANDARD**</u>

9          "A preliminary injunction is an extraordinary remedy never awarded as of right."

10   *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiffs seeking a preliminary

11   injunction must establish that: (1) they are likely to succeed on the merits of their claims; (2) they are

12   likely to suffer irreparable harm absent relief; (3) the balance of equities tips in their favor; and (4) an

13   injunction is in the public interest.  *Id*. at 20.  Plaintiffs bear the burden of making a "clear showing"

14   that they are entitled to injunctive relief.  *Id*. at 22.  "[P]laintiffs must establish that irreparable harm is

15   *likely*, not just possible."  *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)

16   (emphasis in original).  A speculative injury does not establish irreparable injury.  *Caribbean Marine*

17   *Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  Furthermore, Plaintiffs must demonstrate

18   that harm is not only irreparable, but *imminent*.  *Hooper v. City of Seattle*, No. C17-0077RSM,

19   2017 U.S. Dist. LEXIS 20829, at *8 (W.D. Wash. Feb. 14, 2017) (citing *Caribbean Marine*, 844 F.2d

20   at 674).  Finally, "a federal court must exercise restraint" when asked to enjoin a state or local

21   government.  *Midgett v. Tri-Cty. Metro. Transp. Dist.*, 254 F.3d 846, 850-51 (9th Cir. 2001).

22         Plaintiffs note that a preliminary injunction may also be granted where "'serious

23   questions going to the merits'" are raised and "the balance of hardships… tips sharply towards it..."

24   *Disney Enter, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Cottrell*, 632 F.3d

25   at 1135).  Yet Plaintiffs can only avail themselves of this reduced standard if they first "show [] that

26   there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id*.

27   Otherwise, they must prove they are "likely to succeed on the merits."  *Cottrell*, 632 F.3d at 1131.

28

## II.     PLAINTIFFS ARE NOT AT RISK OF IRREPARABLE INJURY

Enforcement of the Ordinances are exceedingly unlikely to harm Plaintiffs at all, let alone irreparably.  Plaintiffs cite the possible loss of their homes if their oversized vehicles are towed for violating an Ordinance.  MPI at 14:9.  Yet Plaintiffs have the burden of demonstrating that such harm is "likely."  *Cottrell*, 632 F.3d at 1131.  This they have not done.  Plaintiffs do not assert that they or anyone else in the community has had a vehicle cited or towed pursuant to the Ordinances.  Plaintiffs' lack of evidence on this point is no accident; there is no such evidence.  Not one single vehicle has been ticketed or towed under either Ordinance.  Nelson Decl., ¶ 4.

Plaintiffs try to make enforcement seem more likely by pointing to the City's past aggressive enforcement of other parking restrictions, like a 72-hour parking limit.  MPI at 6:4-9; Decl. of Celerina Navarro ("Navarro Decl.,", ¶ 8 (describing a 2019 tow for an alleged wastewater violation); Stevens Decl., ¶ 9 (describing multiple tickets for different violations).  Yet aggressive enforcement efforts stopped by the end of 2019, when the City Council began considering ordinances to address the impact of parked oversized vehicles in public rights-of-way.  At that time, the NES Unit transitioned to the education and progression approach that remains in place today.  Decl. of Wahed Magee in Supp. of Def.'s Opp'n to Mot. for Prelim. Inj., ¶ 3; Nelson Decl., ¶ 16.

Furthermore, the City presents evidence demonstrating that the only way Plaintiffs will face citations or towing is if they choose to openly defy the Ordinances, and insist upon staying on a covered street for weeks or even months after being told that they can no longer legally park there.  Nelson Decl., ¶ 15; *see also* p. 8 (summarizing evidence).  This is far from "likely" to occur since none of the Plaintiffs who submitted a declaration[5] express any intent to openly defy the Ordinances.  But even if Plaintiffs do defy the Ordinances, that would mean that any harm suffered by Plaintiffs would be inflicted by Plaintiffs, not the Ordinances.  That does not constitute a harm that qualifies for injunctive relief.  *K.D. v. Oakley Union Elementary Sch. Dist.*, No. C 07-00920 MHP, 2008 U.S. Dist. LEXIS 9559, at *33 (N.D. Cal. Feb. 8, 2008) ("[H]arm is not irreparable if self-inflicted."); *Cal. Pawnbrokers Ass'n, Inc. v. Carter*, No. 2:16-cv-02141-JAM-KJN,

---

[5]  Notably absent from Plaintiffs' papers is a declaration from the sixth named Plaintiff, Evelyn Estrada.

1    2016 U.S. Dist. LEXIS 155100, at *31 (E.D. Cal. Nov. 7, 2016) (similar).

2          Plaintiffs cannot satisfy the irreparable harm element for a second reason: the harms

3    they allege are not imminent. *See Hooper*, 2017 U.S. Dist. LEXIS 20829, at *8.  Lt. Nelson testifies

4    that his officers go to extraordinary lengths to avoid towing occupied vehicles.  They dedicate days or

5    even months to educating violators about the law and working to connect them with services like the

6    Safe Parking Program before resorting to citations or towing.  *Id.,* ¶¶ 5-7.  Thus, even if Plaintiffs

7    cannot comply with the Ordinance immediately, perhaps because they need help to move their vehicle

8    (Aldaco Decl., ¶ 7), they will have weeks or even months to come into compliance.  As Lt. Nelson has

9    testified in connection with an oversized vehicle that is currently violating the Narrow Streets

10   Ordinance, his Unit "has no intention of citing or towing [the residents'] vehicle so long as they

11   continue to make progress towards" a resolution of the violation.  *Id.*, ¶ 11.

12         Plaintiffs also cite the harms they would suffer if they are forced to leave Mountain

13   View.  But the evidence reveals there will be ample street parking available after the Ordinances are

14   fully implemented, and there may also be available Safe Parking spaces.  Pp. 8-9 above (summarizing

15   evidence).  The Ordinances will not force Plaintiffs, or anyone else, to leave the City.

16         Finally, Plaintiffs claim they are being irreparably harmed by the fear of what will

17   happen to them when the Ordinances are fully enforced.  MPI at 14:7-8.  Although the City does not

18   question Plaintiffs' sincerity, it does question why Plaintiffs continue to live in fear when information

19   that would alleviate that fear has been available to them for months.  As noted, the City passed a

20   resolution on December 8, 2020, identifying every street segment covered by the Narrow Streets

21   Ordinance, and the Ordinance itself makes clear that it cannot be enforced until signs are installed on

22   narrow streets.  Trujillo Decl., Ex. Q; Prinzing Decl., Ex. L at 1.  Thus, Plaintiffs (or their lawyers)

23   need only consult the list of covered streets and watch for the installation of street signs to determine

24   when the restrictions will apply.  Furthermore, the City's community outreach officer is currently

25   moving through the City to personally contact occupants of oversized vehicles on the City's narrow

26   streets to provide information about the Ordinance.  Nelson Decl., ¶ 3.

27         To address any lingering confusion, counsel for the City emailed Plaintiffs' counsel on

28   August 13, 2021, noting that "[t]he Complaint indicates that the plaintiffs have significant concerns

about how the Ordinances will be enforced" and offering to "alleviate some of those concerns by providing more information." Plaintiffs did not immediately respond. Prinzing Decl., ¶ 16 & Ex. M. Later, during an August 19 call on other issues, Plaintiffs' counsel asked about the City's plans to implement the Ordinances. Counsel for the City responded with details about the City's plans to install signs and provide notice, while also explaining that the City will only ticket or tow after "an individual has repeatedly refused requests to comply." *Id*., ¶ 17; Trujillo Decl., Ex. CC at 2. This information would reassure Plaintiffs that they will not lose their homes or community. Because "[a] preliminary injunction is an extraordinary remedy,"[6] it should not be issued to address fears that can instead be eased with accurate information.

### III. <u>PLAINTIFFS WILL NOT SUCCEED ON THE MERITS OF THEIR CLAIMS</u>

Any discussion of Plaintiffs' likelihood of success in this lawsuit should begin with the United States Supreme Court's recognition that "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). The Ordinances, which prohibit oversized vehicles from parking in a manner that impedes traffic and threatens public safety, are a valid exercise of the City's police power. Plaintiffs are therefore left to argue that the Ordinances cannot be implemented without violating the Constitution.

Yet the Ordinances have been in partial effect for months – 18 for the Bicycle Lane Ordinance and more than one for the Narrow Streets Ordinance (Lopez Decl., ¶¶ 9, 11) – and Plaintiffs do not allege any constitutional violations to date. That creates a problem for Plaintiffs because they have brought a facial challenge. To succeed on a facial challenge, Plaintiffs must show that the ordinance is invalid in *all* its applications to prohibited conduct, a standard they have already failed to meet based on this existing record. *City of Los Angeles v. Patel,* 576 U.S. 409, 418 (2015). Plaintiffs fare no better with their claims addressing future implementation efforts, as described below.

#### A. <u>Plaintiffs Lack Standing To Seek Injunctive Relief</u>

The Ninth Circuit recently summarized the principles that govern whether Plaintiffs

---

[6] *Winter*, 555 U.S. at 24.

1   have a sufficiently concrete injury to confer standing in this case:

2   > "A plaintiff threatened with future injury has standing to sue 'if the
3   > threatened injury is certainly impending, or there is a substantial risk the
    > harm will occur.'" A plaintiff may not rely "on mere conjecture about
    > possible governmental actions" to demonstrate injury, and must instead
4   > present "concrete evidence to substantiate their fears."

5   > *Index Newspapers LLC v. U.S. Marshals Servs.*,
    > 977 F.3d 817, 825 (9th Cir. 2020) (citations
6   > omitted).

7   The future injuries that Plaintiffs allege are that their vehicles will be towed without

8   notice in violation of the Fourth Amendment, that they will be subject to excessive fines and fees, and

9   that they will be prevented from staying in or visiting Mountain View.  MPI at 14-23.   Based on these

10  alleged injuries, they ask that the City be enjoined from enforcing the Ordinances not just against

11  individuals who live in their oversized vehicles but against everyone — visitors, homeowners, and

12  unsheltered residents alike.  Plaintiffs' request for relief is not only hopelessly overbroad but

13  unsupported by any evidence that their alleged injuries are imminent or even likely to occur, as

14  detailed above and below.  Pp. 11-13, 19.

15  As a consequence, Plaintiffs do not have standing to bring their Fourth Amendment,

16  excessive fines, or right to travel claims.  *See Vonderhaar v. Vill. of Evendale,* 906 F.3d 397, 401

17  (6th Cir. 2018).  In *Vonderhaar*, a village enacted a building code that allowed the building

18  commissioner to inspect rental properties, even after being refused entry.  *Id.* Local rental property

19  owners sued and the district court granted a preliminary injunction on the ground that the code facially

20  violated the Fourth Amendment.  *Id.* at 400.  Yet the appellate court reversed, finding that the code did

21  not authorize a warrantless search, and declarations from village officials confirmed their intent to seek

22  warrants.  *Id.* at 399, 401.  Accordingly, there was no "certainly impending" risk of a warrantless

23  search, and plaintiffs lacked standing to bring a facial challenge.  *Id.* at 401-02. So here, where the

24  evidence also establishes that City officials plan to meet – even exceed – constitutional requirements.

25  This leaves Plaintiffs with statements that they "fear that the city will harshly enforce

26  the [Ordinances] in the near future."  Aldaco Decl., ¶ 10.  Yet allegations of fear of injury must be

27  reasonable to confer standing, and the reasonableness of a claimed fear must be based in reality, not

28  Plaintiffs' subjective apprehensions.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983);

1   *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 184 (2000); *see also*

2   *Haynie v. Harris*, No. C 10-01255 SI, 2014 U.S. Dist. LEXIS 28293, at *28-29 (N.D. Cal. Mar. 4,

3   2014) (plaintiffs' fear of future arrests does not satisfy standing requirements).  Here, Plaintiffs' fears

4   are not reasonable, as the City has already explained.  Pp. 12-13 (summarizing evidence).

5   **B.**   **Towing Under The Ordinances Will Not Violate The Fourth Amendment**

6            Even if Plaintiffs could show an imminent threat that their vehicles may be towed (they

7   cannot), they have cited no case, nor have we found one, in which a court enjoined enforcement of an

8   entire local ordinance on the ground that it might allow police to tow a vehicle in violation of the

9   Fourth Amendment.  Plaintiffs seem to believe that because the Ordinances authorize towing, the City

10  will indiscriminately tow vehicles without cause.  Yet the Mountain View police are going to great

11  lengths to help occupants comply with the Ordinances and avoid towing.  Nelson Decl., ¶¶ 5-15.

12           Still, there must be some means of enforcement if individuals refuse to comply with a

13  valid parking regulation.  Although plaintiffs appear to argue that the Ordinances cannot be

14  implemented constitutionally against them, they offer no legal authority for the proposition that a city

15  may not restrict parking of oversized vehicles on certain public streets.  In fact, courts have upheld

16  parking restrictions that advance arguably less compelling interests.  For example, in *Lone Star & Sec.*

17  *Video, Inc. v. City of Los Angeles,* 584 F.3d 1232, 1236 (9th Cir. 2009), the Ninth Circuit held that

18  towing plaintiffs' vehicles for violating a 72-hour parking limit did not violate substantive due process

19  and that the parking regulation served the rational purpose of encouraging removal of vehicles parked

20  for more than 72 hours in a public place.

21           Rather than challenge the City's authority to regulate parking, Plaintiffs argue that both

22  Ordinances must satisfy the requirements of the community caretaking doctrine, a common law

23  exception to the search and seizure warrant requirement.  MPI at 15:18-19.  Under the community

24  caretaking doctrine, "police officers may impound, vehicles that *jeopardize public safety and the*

25  *efficient movement of vehicular traffic.*"  *United States v. Cervantes,* 703 F.3d  1135, 1141 (9th Cir.

26  2012) (quoting *Miranda v. City of Cornelius*, 429 F.3d 858, 860 (9th Cir. 2005)) (emphasis added).

27  The community caretaking doctrine generally involves a fact-specific inquiry into the conduct of law

28  enforcement officials to determine whether the specific circumstances under which a vehicle was

DEF.'S OPP. TO PLFS.' MOT. FOR                 15
PRELIM. INJ. – NO. 5:21-cv-05381-NC

impounded were justified.

The Ordinances clearly promote public safety and the efficient flow of traffic. They prevent bicycles from being forced into the vehicular traffic lane to avoid oversized vehicles that encroach into the bike lane, and safeguard vehicles from having to pass parked oversized vehicles without adequate space to do so safely. Pp. 3-4 (summarizing evidence). Thus, the community caretaking doctrine would be satisfied if an oversized vehicle is towed for violating either Ordinance.

None of Plaintiffs' cases are to the contrary. Far from it, the cases cited by Plaintiffs involved the conclusion that it was not reasonable to tow or search a vehicle following a citation for driving without a license because the vehicle was safely parked in the owners' driveway (*Miranda*, 429 F.3d at 860-862); that it was not reasonable to search a vehicle for failure to come to a complete stop behind the line at an intersection, where the vehicle did not pose a safety hazard (*Cervantes*, 703 F.3d at 1138-39); and that it was not reasonable to impound a vehicle legally parked in front of the defendant's residence just because the officer was arresting the defendant. (*People v. Williams*, 145 Cal.App.4th 756, 758 (2006)). None of these cases come close to suggesting the community caretaking doctrine prohibits towing a vehicle that jeopardizes public safety and the efficient movement of traffic by violating either Ordinance.

## C.   The City Provides Adequate Notice Prior To Towing

Conspicuously absent from Plaintiffs' brief is the legal standard for notice that applies here or any effort to grapple with how far the notice provided by the City exceeds that standard.

Even assuming that pre-towing notice is required here,[7] the Ninth Circuit has recently held that *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306 (1950) governs claims challenging the adequacy of pre-towing notice. *Grimm v. City of Portland*, 971 F.3d 1060, 1068 (9th Cir. 2020). *Mullane* "requires the government to provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an

---

[7]  Vehicles can sometimes be towed without any notice, such as when a car is parked in the path of traffic. *Clement v. City of Glendale*, 518 F.3d 1090, 1094 (9th Cir. 2008).

opportunity to present their objections.'" *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (quoting *Mullane*, 339 U.S. at 314).  In the pre-towing context, notice should generally take "the form of a ticket placed on the windshield."  *Clement*, 518 F.3d at 1096.

The City provides far more than a ticket placed on a windshield:

- Every covered block will have at least two posted double-sided signs, and every covered cul-de-sac will have at least one double-sided sign, indicating that oversized vehicles that park on that block are subject to towing.[8]  Lopez Decl., ¶¶ 9, 12.

- A community outreach officer seeks to personally provide or deliver notice about the Narrow Streets Ordinance to individuals living in oversized vehicles on streets covered by the Ordinance.  Nelson Decl., ¶ 3.

- In case of a violation, a community outreach officer begins a series of personal contacts with the occupants of the vehicle to educate them about the traffic law at issue and discuss services available to them in Mountain View.  *Id.*, ¶ 5.

- If the vehicle's occupant continues to refuse to comply, the officer may leave a written warning, followed by one or more citation.  *Id.*, ¶¶ 7-8.

- If the vehicle's occupant continues to refuse to comply, the officer provides a final warning with at least three days' notice before towing the vehicle.  *Id.*, ¶ 9.

Lt. Nelson provides several examples of the lengths the Department will go to avoid towing a vehicle, including contacting a vehicle owner while he was incarcerated to identify a friend who could move the vehicle on his behalf.  Nelson Decl., ¶ 13.  On another occasion, an oversized vehicle generated many complaints from local businesses and residents because the occupants were dumping significant amounts of garbage onto the street and sidewalk, including a mattress, chairs, and paint.  Officers contacted the occupants of the vehicle who repeatedly stated they would address the problem, but repeatedly failed to do so, and repeatedly refused to accept services.  Officers worked with the occupants for four to six weeks until eventually a community group offered to tow the vehicle to another location.  At no point did the NES Unit ticket or tow the oversized vehicle, despite the

---

[8]  Plaintiffs challenge the adequacy of the notice provided by the signs (MPI at 18:5-20), but the signs "compl[y] with all state, federal, and professional standards for providing key parking information in the limited space available on parking signs."  Lopez Decl., ¶ 8.

DEF.'S OPP. TO PLFS.' MOT. FOR                17
PRELIM. INJ. – NO. 5:21-cv-05381-NC

occupants' long-standing refusal to address the problem.  *Id.*, ¶ 14.

The law does not demand more than this.

### D.   The City's Fines Are Not Excessive

Plaintiffs' excessive fines claim rests on a false premise: because there will be insufficient parking spaces in Mountain View for oversized vehicles, their vehicles will therefore be ticketed to excess and towed.

Plaintiffs are incorrect.  When both Ordinances are in effect, there will be approximately 34 street segments available for oversized vehicle parking, totaling approximately *five and a half miles*.  Pp. 9-10.

Contrast these facts with the facts in *Blake v. City of Grants Pass*, No. 1:18-cv-01823-CL, 2020 U.S. Dist. LEXIS 129494, *36 (D. Or. July 22, 2020), where the court found that fining an unhoused person $295 for camping and $75 for sleeping is excessive when the person has no choice but to sleep outside.  The *Blake* court explained that "the *decisive consideration* is that Plaintiffs are being punished for engaging in the *unavoidable*, biological, life-sustaining acts of sleeping and resting while also trying to stay warm and dry."  *Id*. at *35 (emphasis added).  Here, Plaintiffs have a choice to avoid fines by parking in other legal spaces and therefore avoid any fines.

Second, Plaintiffs argue that the Ordinances allow for "unlimited ticketing and vehicle impoundment," and speculate that they will face thousands of dollars in fees.  MPI at 18:21, 25-19:1.  Yet the City's actual enforcement has relied successfully on securing voluntary compliance, resulting in *no ticketing or towing* to date (Nelson Decl., ¶ 4), and the City's approach to future enforcement makes clear that there is no likelihood that anyone will be subjected to fines *ad infinitum*.

Because there has been no imposition of any fine here, the claim is arguably not yet ripe.  *See S.F. Tech., Inc. v. Dial Corp.*, 2011 U.S. Dist. LEXIS 32331, *11 (N.D. Cal., Mar. 17, 2011) ("Eighth Amendment challenges are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine.") (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995)); *see also 18 Unnamed "John Smith" Prisoners v. Meese*, 871 F.2d 881, 883 (9th Cir. 1989) (Eighth Amendment claim was not ripe because there was no concrete injury and no

1   way to reasonably conjecture what the actual effect of a policy would be).  The purpose of the ripeness

2   doctrine is to prevent speculation about abstract future events that may never come to pass.  Whether a

3   fine is excessive depends on "the principle of proportionality: The amount of the forfeiture must bear

4   some relationship to the gravity of the offense that it is designed to punish." *U.S. v. Bajakajian*,

5   524 U.S. 321, 334 (1998).  Facts that have yet to happen (and may never happen) would be key to

6   understanding the gravity of any offense under the Ordinances because individuals will not be ticketed

7   or towed until an individual has deliberately refused to comply with the Ordinance over a sustained

8   period of time.  Furthermore, as explained below, fines could be adjusted downward.

9               **1.     A $65 parking ticket fine is not excessive**

10              Plaintiffs also fail to grapple with realities that the City pointed out in its motion to

11  dismiss, namely, that every person who receives a ticket is entitled to an indigency determination to

12  ensure that the cost of a ticket is not more than they can bear.  Def.'s Mot. to Dismiss (ECF No. 26) at

13  7:17-8:5.  This right is set forth in the City's Police Department Policy No. 516 and is required under

14  California law.  Nelson Decl., Ex. H at 2; Cal. Veh. Code § 40215(a) & (c)(7) (providing a procedure

15  that enables individuals to contest parking citations based, among other things, on an individual's

16  inability to pay the parking penalty).  Both forms of tickets used by the City inform individuals that

17  they may contest citations, and one expressly states that registered owners may "apply for an indigency

18  determination."  Nelson Decl., ¶ 17, Exs. D & E.  Thus, any recipient of a parking citation in Mountain

19  View has an opportunity to demonstrate that the cost of a $65 ticket is more than they can afford.

20              Even so, the ticket fine contemplated under the Ordinances is not "grossly

21  disproportional to the gravity of the offense," particularly considering that prior to any ticket being

22  issued, the owner would have ignored individualized notice including personal conversations with a

23  community services officer, offers of assistance, and a non-citation warning.  Nelson Decl., ¶¶ 5, 7.

24  Against these facts, a $65 fine (which may be adjusted downward in the interest of justice), is

25  exceedingly reasonable.  *See Pimentel v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020).

26  Again, the inquiry under the Excessive Fines Clause considers proportionality to consider whether the

27  amount of the forfeiture bears some relationship to the gravity of the offense.  *Bajakajian*, 524 U.S.

28  at 334.  To determine whether a fine is grossly disproportional, "four factors are considered: (1) the

1    nature and extent of the underlying offense; (2) whether the underlying offense related to other illegal

2    activities; (3) whether other penalties may be imposed for the offense; and (4) the extent of the harm

3    caused by the offense." *Pimentel*, 974 F.3d at 921 (citations omitted).

4       In *Pimentel*, the Ninth Circuit applied this test and determined that a $63 parking ticket

5    for overstaying metered street parking time limits was not excessive. *Id*. at 922. Failure to comply

6    with time-limited parking led to increased congestion and impeded traffic flow, and although a parking

7    meter violation "is not a serious offense, the fine is not so large, either, and likely deters violations."

8    *Id*. at 924. The Ninth Circuit also rejected plaintiff's invitation to affirmatively incorporate a means

9    test into the excessive fines analysis to assess a violator's ability to pay. *Id*. at 925; *but see People ex*

10    *rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 37 Cal. 4th 707, 728 (2005) (including ability to pay as one

11    factor in the excessive fines analysis). Even if a means test is required for the excessive fines

12    analysis,[9] as the City has explained in its Motion to Dismiss and above, Plaintiffs will have the

13    opportunity to seek an indigency determination to reduce a ticket fine.

14       Because Mountain View's fine is essentially the same as the fine in *Pimentel*, there is

15    no "gross disproportionality" here. The City has broad authority to fashion fines so long as the amount

16    of the forfeiture "bears 'some relationship' to the gravity of the offense," and the City's determination

17    that $65 is an appropriate fine is afforded substantial deference. *Pimentel,* 974 F.3d at 924; *compare*

18

---

19    [9]  In their Complaint, Plaintiffs cite *Bearden v. Georgia*, 461 U.S. 660 (1983) and *People v.*
*Duenas*, 30 Cal. App. 5th 1157 (2019) and assert that an individualized means analysis is required

20    prior to the imposition of fines. The facts of those cases are markedly different than those here. In
*Bearden*, the Supreme Court held that due process requires a sentencing court to conduct an

21    individualized means assessment before revoking probation for criminal defendants who cannot pay a
court-imposed fine and restitution due to their indigence. *Bearden,* 461 U.S. at 672-73. In *Duenas*, the

22    trial court automatically imposed a combined $70 court facility and court operations assessment fee
and a $150 restitution fine after the defendant had been convicted of driving without a license.

23    *Duenas*, 30 Cal. App. 5th at 1162. The California court of appeal held that under due process, the trial
court must conduct an ability to pay hearing before it imposes court facilities and court operations

24    assessments. *Id*. at 1164. There is a conflict among California courts over whether court fines and
fees may be assessed in the absence of an ability-to-pay hearing, and the California Supreme Court has

25    granted review to determine the answer. *People v. Kopp*, 38 Cal. App. 47 (2019) (review granted
Nov. 13, 2019, S257844). In both *Bearden* and *Duenas*, the courts themselves were imposing the

26    fines. Conducting a means test during that process, which was already underway, presents little
challenge in comparison to the risk of constitutional deprivation. To require a means test *prior* to

27    issuance of every parking ticket, however, would impose an unnecessary and unworkable burden on
local agencies and the courts, particularly because the current scheme *already provides* that anyone

28    who receives a ticket is entitled to seek an indigency determination.

1    Nelson Decl., ¶ 17 ($65 ticket is considerably less than amounts for other parking violations).

2    Furthermore, the "gravity of the offense" is more substantial here than in *Pimentel*, as the Ordinances

3    restrict oversized vehicle parking in the interest of public safety, not just traffic congestion (Lopez

4    Decl., ¶¶ 4, 5); individuals can avoid receiving a ticket by parking elsewhere (*id.*, ¶¶ 14-17); and

5    tickets are reserved for instances of willful, deliberate, sustained refusal to comply.  Nelson Decl., ¶ 9.

### 2.    Passing on storage and towing costs to those who persistently refuse to move their vehicles is not an excessive fine

7    Plaintiffs also cannot succeed on their claim that speculative impoundment and storage

8    costs violate the Eighth Amendment.  For the excessive fines doctrine to apply, Plaintiffs must

9    establish that the fine is punitive, or punishment for an offense, as opposed to a sanction that is purely

10   remedial in nature. *Bajakajian*, 524 U.S. at 327-34; *see* Def.'s Mot. to Dismiss (ECF. No. 26) at 10

11   (collecting cases discussing the non-punitive, remedial nature of towing and storage costs).  In

12   Mountain View, these costs are paid to the towing company, not the police department, to cover the

13   actual towing and storage costs.  Nelson Decl., ¶ 20.  The towing company's maximum charge is

14   governed by contract and is based on a survey of other agencies in the region for comparable and

15   reasonable rates. *Id.* ¶ 22.  The City's administrative fee for release of the vehicle is based on a 2010

16   study of costs the City incurred to process a release, adjusted annually based on the Consumer Price

17   Index. *Id.* ¶ 20.  If the owner of a towed vehicle requests an impoundment hearing, which they are

18   entitled to do under law and City policy, and the hearing officer determines that mitigating

19   circumstances justify a reduction in the fee, the officer can adjust the administrative fee downward.

20   *Id.* ¶ 22.  If the tow was unjustified, the City must pay for the tow and no costs are imposed on the

21   vehicle owner.  Cal. Veh. Code § 22852; Nelson Decl., ¶ 22 & Ex. G at 2.  Because these costs

22   represent the costs incurred to remove an illegally parked vehicle, passing them on to the individual

23   responsible for them is remedial in nature and not an excessive fine.

24   The City has provided evidence that there will be no towing prior to several stages of

25   proactive interventions, essentially requiring that a person willfully refuse to comply with the

26   Ordinances over a sustained period of time.  Trujillo Decl., Ex. CC at 2; Nelson Decl., ¶¶ 9, 15.  This

27   differs markedly from *City of Seattle v. Long*, No. 98824-2, 2021 Wash. LEXIS 433 (Wash. Aug. 12,

2021) – Plaintiffs' only cited case where a court subjected impoundment costs to an Eighth

Amendment analysis – which goes against the weight of the above-cited authority.  In that Washington

state court case, when police informed Mr. Long that he needed to move his vehicle from a public

parking lot, Mr. Long told police that his vehicle did not run, so he could not comply.  The police

followed up with a warning notice that same day and subsequently had it impounded.  *Id*. at *99.

Here, by contrast, the evidence demonstrates that no occupant of an oversized vehicle would be towed

under the Ordinances under these circumstances.  Nelson Decl., ¶¶ 9, 15.

Even so, to conclude the fine was excessive, the *Long* court evaluated the actual fine

imposed by a municipal judge with the benefit of a complete factual record as to the circumstances that

resulted in the tow, how those costs affected the petitioner, and the various interests at stake, including

the City's.  *Long,* 2021 Wash. LEXIS 433 at *46-52.  Here, Plaintiffs are unlikely to succeed on their

claim that as yet unknown, unimposed costs are excessive fines because towing would occur only after

a person deliberately refused to comply with the Ordinances after refusing offers of assistance and

ignoring warnings over a sustained period of time, and because Plaintiffs can avoid these costs by

parking on streets that are not covered by the Ordinances.

### E.     Plaintiffs Cannot Succeed On Their Right To Travel Claim

Plaintiffs' right to travel argument rests on the fallacy that the Ordinances will "prevent

Plaintiffs from staying in or visiting Mountain View."  *See* MPI at 20:17.  Yet the Ordinances simply

regulate where Plaintiffs may park while leaving ample space to park elsewhere in the City.  Pp. 8-10

(summarizing evidence).

Viewed objectively and in light of these facts, the Ordinances raise no concerns under

the right-to-travel doctrine.  A law implicates the right to travel when (1) it actually deters such travel;

(2) when impeding travel is the law's primary objective; or (3) when the law uses any classification

which serves to penalize the exercise of that right.  *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898,

903 (1986); *accord Tobe v. City of Santa Ana*, 9 Cal. 4th 1069 (1995).  Caselaw demonstrates that only

direct, serious burdens on the right to travel raise constitutional concerns, such as restrictions that

prohibit a person's physical movement, like a curfew (*e.g.*, *Nunez by Nunez v. San Diego*,

114 F.3d 935, 949 (1997)), or discrimination against newcomers by denying them benefits, like public

1  assistance payments (*Shapiro v. Thompson*, 394 U.S. 618, 641-42 (1969)), medical services (*Mem'l*

2  *Hosp. v. Maricopa County*, 415 U.S. 250, 269-70 (1974)), or the right to vote.  *Dunn v. Blumstein*,

3  405 U.S. 330, 338 (1972).

4          The right does not extend so far as to guarantee anyone the "right to live or stay where

5  one will," and nondiscriminatory ordinances that have incidental or indirect burdens on travel, such as

6  parking or camping restrictions, do not raise constitutional right to travel concerns.  *Tobe*,

7  9 Cal. 4th 1103.  Accordingly, courts in the Ninth Circuit have made clear that the right is not violated

8  in cases like this, when unhoused persons are required to move to an alternative location.  *See Aitken v.*

9  *City of Aberdeen*, 393 F. Supp. 3d 1075, 1084 (W.D. Wash. 2019); *Roulette v. City of Seattle*,

10  850 F. Supp. 1442, 1448 (W.D. Wash. 1994), *aff'd*, 78 F.3d 1425 (9th Cir. 1996); *Veterans for Peace*

11  *Greater Seattle v. City of Seattle*, No. C09-1032 RSM, 2009 U.S. Dist. LEXIS 77040, at *11

12  (W.D. Wash. July 24, 2009) (the right to travel is not directly implicated when individuals seek "to

13  remain at a certain place"); *Davison v. City of Tucson*, 924 F. Supp. 989, 993-94 (D. Ariz. 1996) (right

14  to travel is not implicated where indigent person sought only to remain in prohibited location); *Joyce v.*

15  *City & County of S.F.*, 846 F. Supp. 843, 864 (N.D. Cal. 1994) (rejecting challenge to ordinances

16  prohibiting camping in public parks or obstructing sidewalks); *accord Tobe*, 9 Cal. 4th at 1104 (anti-

17  camping ordinance not violative of constitutional right to travel despite incidentally burdening

18  individuals who could not obtain other accommodations).  Such laws are subjected to rational basis

19  review: they are presumed valid, and plaintiff must show that no rational basis supports them.  *See*

20  *Tobe*, 9 Cal. 4th at 1100-01.

21          These cases doom Plaintiffs' claim.  The Ordinances do not forbid any person's travel,

22  nor do they deprive any person of government services.  They simply regulate where oversized

23  vehicles may park, and as explained above, any person can continue to park an oversized vehicle on

24  approximately 5.5 miles of public streets throughout the City.  Because limiting oversized vehicle

25  parking on narrow streets and roads with bike lanes is rationally related to the Ordinances' stated

26  purpose of improving traffic safety (Lopez Decl., ¶¶ 5-6), the Ordinances satisfy rational basis review.

27          Even if the Ordinances were subject to strict scrutiny, as Plaintiffs urge (MPI at 22-23),

28  they satisfy that standard.  In *Veterans for Peace Greater Seattle*, the court found plaintiffs unlikely to

succeed on the merits of their right to travel claim and denied their motion for preliminary injunction because the law at issue, which prohibited plaintiffs from camping on public property, sought to limit individuals' right to remain in a particular place and therefore did not implicate the fundamental right to travel.  Nonetheless, the court explained that the ordinance furthered the City's compelling interest in protecting public health and safety.  *Veterans for Peace Greater Seattle,* 2009 U.S. Dist. LEXIS 77040, at *11-14.  And as counsel for Plaintiffs argued just six months ago before Judge Chhabria in *Geary et. al. v. City of Pacifica*, No. 3:21-cv-01780-VC (N.D. Cal.) when seeking to enjoin the City of Pacifica's oversized vehicle ordinance, an ordinance restricting parking is narrowly tailored to address the compelling interest of traffic safety concerns by "restrict[ing oversized vehicle] parking only *where safety [is] obviously implicated*, or creat[ing] a safe parking program for those who are vehicularly housed."  Prinzing Decl., Ex. N at 18 (emphasis added).  Here, Mountain View has done both.  Lopez Decl., ¶¶ 5, 6; Thomas Decl., ¶¶ 7-10.

Plaintiffs attempt to avoid their own attorneys' argument in *Geary* by denigrating the Safe Parking Program and asserting that Mountain View should have "collected and analyzed traffic and safety data" and "restricted [oversized vehicle] parking only where safety was actually implicated."  MPI at 9 n.2; 23:5-6.  But the Safe Parking Program is successfully serving up to 68 oversized vehicles each day.  Thomas Decl., ¶¶ 7-10.  And the City Traffic Engineer has explained how the Ordinances advance traffic safety by preventing bicycles and passing vehicles from having to swerve into oncoming traffic to avoid parked oversized vehicles.  Lopez Decl., ¶¶ 5, 6.  Just as plaintiffs demanded in *Geary*, the City has restricted parking only where safety is obviously implicated and has created a Safe Parking Program.  The Ordinances therefore survive strict scrutiny under Plaintiffs' counsel's own argument.

## IV.   THE EQUITIES REQUIRE THAT THIS MOTION BE DENIED

If this preliminary injunction is not issued, Plaintiffs will lose nothing except perhaps their preferred parking spot.  Plaintiff Celerina Navarro will not even lose that, since she is parked in a Safe Parking spot.  Navarro Decl., ¶ 12.  In any event, Plaintiffs who want alternative parking have many other options on City streets.  Moreover, the City's commitment to compassionate enforcement through education and offers of services ensures that Plaintiffs will be able to voluntarily comply with

1   the Ordinances without any realistic risk of tickets or towing.  Simply put, the City is going to

2   extraordinary lengths to advance traffic safety for the entire community without imposing undue

3   burdens on occupants of oversized vehicles.

4            By contrast, if this preliminary injunction is issued, it will harm unrepresented third

5   parties, namely those pedestrians, bicyclists, and motorists who want to use Mountain View's streets

6   safely.  *See Publ'n Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473, 478 (7th Cir. 1996) (courts "must

7   consider the effect of the injunction upon nonparties."); *Horwitz v. Southwest Forest Industries, Inc*.,

8   604 F. Supp. 1130, 1136 (D. Nev. 1985) (denying injunction despite a possibility of success on the

9   merits in part because injunction could harm unrepresented investors).  And it would do so in a way

10   that thwarts the will of Mountain View voters, nearly 57% of whom voted in favor of the traffic safety

11   protections in the Narrow Streets Ordinance.  Prinzing Decl., Ex. G.  Plaintiffs' efforts to dismiss the

12   value of these public safety measures are not well-taken.  The fact that a bicyclist or motorist has not

13   previously been injured or killed due to the encroachment of an oversized vehicle into the public right-

14   of-way is no guarantee against future injuries or deaths.  MPI at 24:5-6.

15            Because public safety outweighs parking preferences, this motion should be denied.

16

17   Dated:  September 20, 2021                    Respectfully submitted,

18                                                OLSON REMCHO LLP

19

20                                                By:  ___/S/ Margaret R. Prinzing_____
                                                      Margaret R. Prinzing

21                                                Attorneys for Defendant City of Mountain View

22   (00446510)

23

24

25

26

27

28